# STATE OF MICHIGAN

# COURT OF APPEALS

STANLEY G. DENHOF,

Plaintiff-Appellant,

v

JENNELL L. CHALLA,

Defendant-Appellee.

FOR PUBLICATION
July 28, 2015
9:10 a.m.

No. 321862
Ottawa Circuit Court
LC No. 13-003420-CZ

Before: MARKEY, P.J., and MURPHY and STEPHENS, JJ.

MURPHY, J.

Plaintiff Stanley G. Denhof appeals as of right an opinion and order issued by the trial court granting summary disposition in favor of defendant Jennell L. Challa, who is the Ottawa County Friend of the Court.[1] Acting pro per, Denhof initiated a civil action against Challa, alleging multiple counts of fraud and a single count of obstruction of justice associated with statements made and actions taken by Challa relative to family division proceedings concerning Denhof's payment of child support to his ex-wife. Denhof commenced the lawsuit from prison, where he is serving a 14 to 75 year term of imprisonment for convictions on three counts of first-degree criminal sexual conduct (CSC I), MCL 750.520b(1)(a) (victim under 13 years of age), after sexually abusing his young daughter.[2] The trial court determined that Challa was shielded from liability on the basis of quasi-judicial, absolute immunity and summarily dismissed the lawsuit. We affirm.

---

[1] Under MCL 552.502(n), the " 'Friend of the court' means *the person* serving . . . as the head of the office of the friend of the court [FOC]." (Emphasis added.) Challa, therefore, is the FOC for the county. To avoid any confusion in this opinion, when speaking of Challa while personally acting in her role as the FOC, we shall continue to refer to her by her proper name, and when speaking in general terms of the "office" of the FOC, we shall use the acronym.

[2] In *People v Denhof*, unpublished opinion per curiam of the Court of Appeals, issued December 14, 2010 (Docket No. 287720), this Court affirmed the convictions. Denhof's application for leave to appeal this Court's ruling was denied by our Supreme Court. *People v Denhof*, 489 Mich 899; 796 NW2d 90 (2011).

-1-

# I. BACKGROUND

## A. UNDERLYING CHILD SUPPORT LITIGATION

Denhof and his ex-wife had two children, a boy and a girl, and divorced in 2003. Denhof was ordered to pay child support for the two children. In March 2008, Denhof was arrested on the CSC I charges. In July 2008, he went on trial in the criminal case and was convicted by a jury. Denhof was sentenced in August 2008. In September 2008, he notified the FOC by letter about his incarceration. In light of Denhof's imprisonment, an order was entered in November 2008, with the FOC's endorsement, suspending Denhof's child support obligation.[3] There was an existing balance due and owing for past unpaid child support, and in March 2009, Denhof's federal income tax return was garnished, covering most if not all of the arrearage. The record also contains a December 2010 order to remit prisoner funds for child support, directing the Department of Corrections (DOC) to "collect 50% of all funds received by the prisoner [Denhof] over $50.00 each month." It does not appear that any child support was collected by the DOC under this order.

In a February 2011 court order, which acknowledged that ongoing child support had been suspended starting back in November 2008, the court amended the November 2008 order by providing that the suspension of child support should have commenced even earlier – in September 2008 (shortly after Denhof's conviction and sentencing). The FOC proceeded to notify Denhof that given the amended order, Denhof's ex-wife had effectively been overpaid child support in the amount of $558, but the FOC still demanded that Denhof pay $218 in FOC fees. A court order was entered shortly thereafter, requiring Denhof's ex-wife to reimburse him the $558, with Denhof to continue paying "the amount of $0 per week for support" in light of the suspension of child support due to his incarceration. The order was silent regarding the $218 in FOC fees, and the FOC continued to seek payment of the fees. In August 2011, Denhof filed a

---

[3] In *Pierce v Pierce*, 162 Mich App 370, 370-371; 412 NW2d 291 (1987), this Court held as follows with respect to child support and an imprisoned parent:

> After giving careful consideration to this matter, we adopt the view . . . that where a noncustodial parent is imprisoned for a crime other than nonsupport that parent is not liable for child support while incarcerated unless it is affirmatively shown that he or she has income or assets to make such payments. . . . .

> . . .

> [I]f an incarcerated parent with an arrearage has assets or income while in prison, then those assets or the income may properly be applied against the outstanding child support obligation. We conclude that a noncustodial parent's support arrearage which accrued while the parent was imprisoned should be discharged unless there is some showing that the parent became incarcerated in order to avoid his support obligation.

grievance with Challa, complaining that two FOC employees had made various errors with respect to calculating Denhof's child support obligation and that one of the employees had intentionally supplied the family court with false information regarding support. Challa rejected the grievance, but she agreed to seek a court order authorizing the FOC to take steps to obtain reimbursement from Denhof's ex-wife with respect to the $558 support overpayment. And, if and when payment was obtained, the FOC would forward the funds to Denhof, minus the $218 in FOC fees that Denhoff still owed.

Unhappy with Challa's position, Denhoff then allegedly sent letters about the matter to the family court, the Michigan Attorney General, and the Governor. Subsequently, in September 2011, Challa informed Denhof that the FOC fees actually amounted to only $134 and not $218, which adjustment was the result of an error associated with calculating the suspension period tied to Denhof's imprisonment. And with respect to the $134 FOC fee balance, Challa agreed to waive those fees, leaving Denhof with no child-support related debt. In November 2011, it appears that $300 was garnished from the paycheck of Denhof's ex-wife relative to her obligation to reimburse Denhoff for overpaid child support. However, the FOC ceased efforts to obtain further payment from Denhof's ex-wife because Challa came to the conclusion, as she conveyed to Denhof, that child support "suspensions [due to imprisonment] are not provided if the underlying offense is criminal sexual conduct against a child upon which the child support obligation is established." We note that in *Pierce v Pierce*, 162 Mich App 370; 412 NW2d 291 (1987), this Court did not carve out such an exception. Challa now believed that the FOC had been mistaken in agreeing with the suspension of child support based on Denhof's imprisonment.

Given the change in Challa's stance, the FOC petitioned the family court for reinstatement of suspended support. Denhof alleged that his attorney, in order to prepare for the hearing on the FOC petition, sought to review the entire FOC file concerning the family law litigation between Denhof and his ex-wife, but Challa denied him access. A hearing was conducted over two days, April 23 and 30, 2012, with respect to the petition for reinstatement of suspended child support and a motion by Denhof seeking an order requiring the FOC to allow Denhof access to the FOC file. Denhof alleged that Challa falsely informed the family court that Denhof's counsel had been able to review the FOC file on two occasions prior to the hearing and that she falsely told the court that she had just recently learned of the nature of Denhof's conviction.[4] Denhof further alleged that Challa, trumpeting *Pierce*, 162 Mich App 370, insisted to the family court during the hearing that it had been unnecessary to suspend child support payments during Denhof's incarceration and that the court could continue to assess child support at a minimum monthly threshold, considering that Denhof's conviction involved the commission of a CSC against a child who was the beneficiary of the support.

In May 2012, the family court entered an order, which reflected that the court did not agree with Challa and the FOC's new position. The order provided that Denhof's support obligation would "not be retroactively modified and [would] remain suspended." The order did additionally provide that Denhof's ex-wife's "obligation to repay . . . [Denhof was] set to zero."

---

[4] We have no transcript of the hearing.

-3-

The order did not speak directly to the issue of Denhof's effort to access the FOC file. Denhof alleged that several weeks later, his attorney was finally permitted to view the FOC file, at which time Challa advised counsel that a document concerning a June 2002 meeting had been destroyed, given that the issue that formed the subject-matter of the meeting had been resolved. Denhof maintained that the destroyed document had indicated that he had taken "his children to counseling at the YWCA," which information would have assisted Denhof in proving his innocence in the CSC prosecution.

## B. DENHOF'S CIVIL LAWSUIT – FRAUD AND OBSTRUCTION OF JUSTICE

In August 2013, Denhof filed the instant lawsuit against Challa. In count I of his complaint, Denhof alleged that Challa committed fraud when she misrepresented to the family court that Denhof's attorney had viewed the FOC file before the April 2012 hearing, employing the fraud to confuse the court into believing that his attorney "was well-prepared." In count II of his complaint, Denhof alleged that Challa committed fraud when she misrepresented to the family court in April 2012 that she had just recently learned of Denhof's CSC I conviction, where she had actually been aware of the nature of the conviction three years earlier. In count III of his complaint, Denhof alleged that Challa committed fraud by essentially misquoting *Pierce* to the family court and by otherwise presenting legally-inaccurate arguments during the April 2012 hearing. Finally, in count IV of his complaint, Denhof alleged that Challa engaged in obstruction of justice under MCL 750.483a(5) by withholding and destroying the June 2002 FOC document, which constituted exculpatory evidence relative to the CSC case.[5]

Following the filing of Denhof's civil complaint against Challa, the judges of the Ottawa Circuit Court recused themselves, entering an order of disqualification because Challa was employed by the Ottawa Circuit Court.[6] The State Court Administrative Office (SCAO) temporarily assigned a judge of the Kent Circuit Court to serve as a judge of the Ottawa Circuit Court for purposes of presiding over Denhof's suit against Challa. Subsequently, Challa filed a motion for summary disposition pursuant to MCR 2.116(C)(7). Challa made an initial argument that there were "numerous pleading problems with the Complaint," including a failure to allege monetary damages flowing from the alleged fraud, a failure to allege that the June 2002 FOC document was not destroyed in the normal course of business, a failure to allege that the information in the document could not have been established by way of other evidence at the criminal trial, and a failure to allege how that information could possibly have established his innocence in the criminal case. However, Challa's primary argument was that Denhof had failed to plead in avoidance of "governmental and quasi-judicial immunity." Challa argued that, for

---

[5] MCL 750.483a(5) provides that a person shall not "[k]nowingly and intentionally remove, alter, conceal, destroy, or otherwise tamper with evidence to be offered in a present or future official proceeding." We note that Challa denied as untrue Denhof's allegation that she had informed Denhof's counsel that the FOC document had been destroyed. We further mention that by April 2012, the trial and appellate processes in the criminal case had long been concluded.

[6] MCL 552.503(4) provides that "[t]he friend of the court is an employee of the circuit court in the judicial circuit served by the friend of the court."

purposes of governmental immunity and the alleged intentional torts, Denhof had failed to allege any conduct on Challa's part that was objectively unreasonable. Challa additionally contended that her role as head of the FOC provided her with quasi-judicial, absolute immunity. Challa further maintained that the alleged wrongdoings pertained to matters within a judicial proceeding – the family court support litigation – and therefore the judicial-proceedings privilege shielded Challa from liability. Challa argued that Denhof's lawsuit was ill-conceived and a wrongful attempt to relitigate the child support and criminal cases.

Denhof filed a response to Challa's motion for summary disposition, as well as filing a motion to adjourn the summary disposition hearing, a motion for change of venue, and a motion to disqualify the SCAO-appointed trial court. The trial court conducted a hearing on all of the motions and denied Denhof's adjournment, disqualification, and venue motions in short explanatory orders.[7] The trial court granted Challa's motion for summary disposition in a written opinion and order. The trial court had been able to review transcripts of the family court hearing that took place in April 2012.[8] The trial court ruled that quasi-judicial, absolute immunity applied and barred Denhof's suit. The trial court noted that, at the family court hearing in April 2012, Challa "most assuredly was acting in her official capacity as a representative of the court." The trial court concluded its opinion, stating:

> In short, because . . . Challa was acting in her official capacity as the
> [FOC], she can avail herself of absolute immunity from all of . . . Denhof's claims
> arising from the manner in which she discharged her duties. Thus, the [c]ourt

---

[7] The trial court denied the adjournment motion because both sides had fully briefed the issues related to summary disposition and were prepared to proceed. The court accurately noted that it had allowed and heard extensive oral arguments on the scheduled hearing date. The trial court denied the change-of-venue motion because Ottawa County was "the most logical venue for this litigation" and all other possible venues could not be regarded as being more appropriate or convenient. The trial court denied the disqualification motion because it had no "knowledge of, or contact with, either party" and simply took the case upon SCAO's invitation.

[8] Referencing the transcripts, the trial court noted that, as to April 23, 2012, Denhof's attorney had pressed the family court to allow access to the FOC file, which the FOC had denied given that no court order permitted access. The family court put the matter over until April 30, 2012. According to the trial court, Challa appeared before the family court on April 30 and informed the family court that Denhof's counsel had been afforded access to non-confidential parts of the FOC file but he was not entitled to view confidential aspects of the file regarding a custody investigation. In further reference to the transcripts, the trial court indicated that Challa had advised the family court that she had only recently discovered that Denhof's child was the victim of the CSC offenses and that, because of that fact, the FOC should never have invited suspension of Denhof's child support obligation. Finally, the trial court noted that the family court, having decided to eliminate all child support obligations of both Denhof and his ex-wife, concluded that its decision rendered file access unnecessary.

-5-

must award summary disposition to . . . Challa pursuant to MCR 2.116(C)(7) on all of the claims set forth in . . . Denhof's complaint.[9.]

Various motions for reconsideration filed by Denhof in regard to summary disposition, judicial disqualification, and change of venue were denied, as was a subsequent new motion for judicial disqualification. Denhof appeals as of right.

## II. ANALYSIS

### A. STANDARD OF REVIEW

We review de novo a trial court's ruling on a motion for summary disposition. *Spiek v Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998). The applicability of immunity is likewise reviewed de novo on appeal. *Snead v John Carlo, Inc*, 294 Mich App 343, 354; 813 NW2d 294 (2011). "We also review de novo as a question of law the applicability of a privilege." *Oesterle v Wallace*, 272 Mich App 260, 263; 725 NW2d 470 (2006).

### B. GOVERNING PRINCIPLES WITH RESPECT TO MCR 2.116(C)(7)

MCR 2.116(C)(7) provides for summary disposition when a claim is "barred because of . . . immunity granted by law . . . ." The movant may submit affidavits, depositions, admissions, or other documentary evidence in support of the motion if substantively admissible. *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008). The complaint's contents are accepted as true unless contradicted by the documentary evidence. *Id.* This Court must consider the documentary evidence in a light most favorable to the nonmoving party for purposes of MCR 2.116(C)(7). *RDM Holdings, Ltd v Continental Plastics Co*, 281 Mich App 678, 687; 762 NW2d 529 (2008). "If there is no factual dispute, whether a plaintiff's claim is barred under a principle set forth in MCR 2.116(C)(7) is a question of law for the court to decide." *Id.* When, however, a relevant factual dispute does exist, summary disposition is not appropriate. *Id.*

### C. DISCUSSION

We hold that Denhof's fraud claims fail as a matter of law because Challa was shielded from liability under the common-law doctrine of quasi-judicial immunity.[10] As explained below, the doctrine of quasi-judicial immunity as developed by the common law has at least two somewhat distinct branches, one focused more on the nature of the job-related duties, roles, or functions of the person claiming immunity and one focused more on the fact that the person claiming immunity made statements or submissions in an underlying judicial proceeding, at times referred to as the judicial-proceedings privilege. Challa had argued in support of both variations of quasi-judicial immunity in pursuing summary disposition. The trial court ruled that

---

[9] The trial court additionally ruled that the obstruction of justice claim under MCL 750.483a(5) could not survive summary disposition because courts were not permitted to "recognize a private cause of action for a violation of that criminal statute."

[10] We shall separately address the obstruction of justice claim.

quasi-judicial immunity protected Challa from liability given that she had been "acting in her official capacity as the Friend of the Court." The trial court found that Challa was entitled to quasi-judicial immunity in light of her job-related duties and not necessarily because she had made statements or submissions in a judicial proceeding. We conclude that both branches of quasi-judicial immunity were implicated and applicable in this case in regard to the fraud claims.

We shall begin by examining the form of quasi-judicial immunity that served as the basis for the trial court's ruling, concentrating on the nature of Challa's FOC duties. We initially emphasize that our analysis is not grounded in MCL 691.1407(5), which provides that "[a] judge . . . [is] immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial . . . authority." Challa is not a judge and thus does not fall within the parameters of MCL 691.1407(5).[11] However, as a common-law doctrine, this Court in *Diehl v Danuloff*, 242 Mich App 120, 127-128; 618 NW2d 83 (2000), observed that "Michigan courts have . . . recognized the doctrine of quasi-judicial immunity in various circumstances."

In *Diehl*, the plaintiff filed suit against the defendant, a licensed psychologist, alleging that the defendant was professionally negligent in the manner in which he had performed court-ordered psychological testing and a custody evaluation. Although this Court found that MCL 691.1407 did not afford the defendant immunity from suit, it did apply quasi-judicial immunity as developed through the caselaw. *Id.* at 127-135.[12] The Court explained:

> Here, the trial court appointed defendant to assist in the custody determination by evaluating the children's familial unit, following any procedure

---

[11] This is not to say that MCL 691.1407 has no relevance in this case. Challa is a governmental employee and "MCL 691.1407(3) . . . grants immunity to governmental employees from intentional-tort liability to the extent allowed by the common law before July 7, 1986." *Odom*, 482 Mich at 461. The *Odom* Court stated:

> A governmental employee must raise governmental immunity as an affirmative defense and establish that (1) the employee's challenged acts were undertaken during the course of employment and that the employee was acting, or reasonably believed he was acting, within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature. [*Id.*]

The trial court did not address Challa's argument concerning general governmental immunity and *Odom*, Challa did not submit any documentary evidence that would have allowed for a proper analysis under *Odom*, and we find it unnecessary to reach the issue in this appeal.

[12] The Court held that while the "defendant was not entitled to governmental immunity under MCL 691.1407[,] . . . summary disposition was nonetheless proper because defendant enjoyed quasi-judicial immunity from suit." *Diehl*, 242 Mich App at 124.

he deemed appropriate. . . . Plaintiff's allegations stem directly from defendant's role in the custody proceeding. *In acting pursuant to his court appointment, defendant served as "an arm of the court" and "performed a function integral to the judicial process."* Thus, we hold that a court appointed psychologist, such as defendant, ordered to conduct a psychological evaluation and submit a recommendation to the trial court in a custody proceeding is entitled to absolute quasi-judicial immunity. The trial court did not err in granting summary disposition to defendant.

Our conclusion that defendant was protected by quasi-judicial immunity is also well supported by a number of public policy considerations, including (1) the need to save judicial time in defending suits, (2) the need for finality in the resolution of disputes, (3) to prevent the threat of lawsuit from discouraging independent action, and (4) the existence of adequate procedural safeguards. [*Id.* at 132-133 (emphasis added; citations omitted).]

The Court stated that, "[m]ost importantly, . . . if these individuals are subject to lawsuits, they will be much less willing to serve the court[.]" *Id.* at 134. The Court also recognized that, "[w]ith virtual uniformity, courts in other jurisdictions have granted quasi-judicial immunity to individuals who perform functions analogous to those performed by defendant in the present case." *Id.* at 129.

The *Diehl* panel relied in part on *Martin v Children's Aid Society*, 215 Mich App 88; 544 NW2d 651 (1996),[13] where this Court granted absolute immunity to a private organization, the Children's Aid Society (CAS), which was under contract with the state to provide services for abused and neglected children. In *Martin*, the plaintiffs had alleged causes of action against CAS and others that included negligence, bad faith, and breach of statutory and contractual duties arising out of child protective proceedings. The plaintiffs maintained that they were separated from their daughter on the basis of unfounded claims of abuse. *Id.* at 90-93. The Court stated that providing immunity was vital to avoiding overly cautious, trepid, and restrained decision-making in safeguarding the lives of children. *Id.* at 97-98. The *Martin* panel, quoting the CAS's brief, asserted that undaunted " '[p]rofessional assistance to the . . . Court is critical to its ability to make informed, life deciding judgments relating to its continuing jurisdiction over abused children.' " *Id.* at 97. The Court noted that "the immunity we afford to the CAS . . . does not arise from . . . [MCL 691.1407]." *Id.* at 95-96 n 5.

In the Friend of the Court Act (FCA), MCL 552.501 *et seq.*, the Legislature expressed the multiple purposes of the FCA, stating as follows:

The purposes of this act are to enumerate and describe the powers and duties of the friend of the court and the office of the friend of the court; to ensure that procedures adopted by the friend of the court will protect the best interests of children in domestic relations matters; to encourage and assist parties voluntarily

---

[13] See *Diehl*, 242 Mich App at 128 n 1.

to resolve contested domestic relations matters by agreement; to compel the enforcement of parenting time and custody orders; and to compel the enforcement of support orders, ensuring that persons legally responsible for the care and support of children assume their legal obligations and reducing the financial cost to this state of providing public assistance funds for the care of children. This act shall be construed to promote the enumerated purposes and to facilitate the resolution of domestic relations matters. [MCL 552.501.]

"The intent of the Legislature in enacting the [FCA] . . . was to create an investigative and fact-finding *arm of the circuit court* in domestic relations matters." *Marshall v Beal*, 158 Mich App 582, 590; 405 NW2d 101 (1986) (emphasis added); see also *D'Allessandro v Ely*, 173 Mich App 788, 800; 434 NW2d 662 (1988). The nomenclature itself used by the Legislature denotes the close working relationship envisioned between an FOC office and a family court, i.e., "friend of the court." The duties assigned to an FOC office all "involve either the dissemination of information to the parties or the investigation and compilation of facts for use by the circuit court judge." *Marshall*, 158 Mich App at 590.

The FCA enumerates the duties that the FOC must perform, including, in part, the following duties found in MCL 552.505(1):

> (g) To investigate all relevant facts, and to make a written report and recommendation to the parties and to the court, regarding child custody or parenting time, or both, if ordered to do so by the court. If custody has been established by court order, the court shall order an investigation only if the court first finds that proper cause has been shown or that there has been a change of circumstances. The investigation may include reports and evaluations by outside persons or agencies if requested by the parties or the court, and shall include documentation of alleged facts, if practicable. If requested by a party, an investigation shall include a meeting with the party. A written report and recommendation regarding child custody or parenting time, or both, shall be based upon the factors enumerated in the child custody act of 1970, 1970 PA 91, MCL 722.21 to 722.31.

> (h) To investigate all relevant facts and to make a written report and recommendation to the parties and their attorneys and to the court regarding child support, if ordered to do so by the court. The written report and recommendation shall be placed in the court file. The investigation may include reports and evaluations by outside persons or agencies if requested by the parties or the court, and shall include documentation of alleged facts, if practicable. The child support formula developed by the bureau under section 19 shall be used as a guideline in recommending child support. The written report shall include the support amount determined by application of the child support formula and all factual assumptions upon which that support amount is based. . . . .

An FOC office also engages in enforcing support orders, MCL 552.511, enforcing orders for the payment of healthcare expenses, MCL 552.511a, and enforcing custody and parenting-time orders, MCL 552.511b.

Just as the psychologist performing court-ordered custody evaluations in *Diehl* and the CAS assisting the court by providing services to abused and neglected children in *Martin*, we hold that Challa was entitled to quasi-judicial immunity. We reach this conclusion because an FOC office is an arm of the family court, performs functions integral to the judicial process, provides critical assistance to the court related to the ultimate resolution of disputes, and because the judicial process in domestic relations matters could not properly and effectively function absent the FOC. These points are evident considering an FOC's indispensable and legally-mandated involvement in: (1) encouraging and assisting parties in resolving disputed domestic relations matters; (2) performing investigations, along with compiling, finding, and assessing facts, as well as preparing reports, recommendations, and evaluations, all relative to custody, parenting time, and support; (3) seeking and pursuing the enforcement of custody, parenting-time, and support orders; and (4) in generally providing invaluable assistance to the family court.

Our conclusion is buttressed by the following footnote contained in this Court's opinion in *Diehl*:

> We additionally note that defendant was appointed by the trial court to act as a factfinder and provide information essential to the decision-making process. In contrast to a psychologist who is appointed by the court to render treatment to a party or individual, a remedial function arguably unrelated to the fact-finding and decision-making processes of the court, a psychologist appointed by the court to evaluate a family and make a recommendation in a custody dispute is performing a function intimately related and essential to the judicial process. Indeed, defendant's focus in performing evaluations, providing reports, and making recommendations was not necessarily on the best interests of the subject being evaluated or the parties involved in the litigation, but on aiding the court to separate truth from falsity. In this context, the need for absolute immunity is compelling. [*Diehl*, 242 Mich App at 133 n 3 (citations omitted).]

As reflected above, an FOC's statutorily-based role entails fact-finding, providing information, performing evaluations, preparing reports, making recommendations, and aiding the family court in separating truth from falsity, all as intimately related and essential to the judicial process and decision-making by the family court.

Our ruling also finds support in an opinion issued by the Sixth Circuit in *Johnson v Granholm*, 662 F2d 449 (CA 6, 1981), wherein the plaintiff filed an action for damages against, amongst others, two former Michigan friends of the court related to the manner in which they had dealt with the failure of the plaintiff's ex-husband in making child support payments under a divorce judgment. The Sixth Circuit held:

> Our examination of the Michigan statutes which prescribe the duties and responsibilities of friends of the court leads us to the conclusion that the acts of the defendants[,] . . . which form the basis of the plaintiff's claims[,] were performed by these defendants within the scope of their official quasi-judicial duties. Therefore, they were . . . entitled to immunity. [*Id.* at 450.]

Challa pled the affirmative defense of immunity as required by MCR 2.111(F)(3)(a). Further, there can be no reasonable dispute that Challa was acting within the scope of her authority or official duties with respect to her conduct in addressing the family court in the April 2012 hearing and in regard to any communications that she may have had with Denhof's counsel concerning the FOC file. We conclude that she was shielded from liability in regard to the fraud claims on the basis of quasi-judicial immunity tied to her position, role, and duties as the county FOC.

Turning to the second branch of quasi-judicial immunity, the *Diehl* panel stated that our courts have "recognized the doctrine of quasi-judicial immunity *in various circumstances*," citing in support of this statement, in part, *Maiden v Rozwood*, 461 Mich 109; 597 NW2d 817 (1999). *Diehl*, 242 Mich App at 128 n 1 (emphasis added). In *Maiden*, one issue concerned statements made by a medical examiner while testifying at a criminal preliminary examination against the plaintiff who later sued the medical examiner for gross negligence associated with an allegedly flawed medical theory inculpating the plaintiff on a murder charge. In the context of discussing the concepts of duty and witness immunity, the *Maiden* Court made the following observations that were later cited in *Diehl*:

> Further, *witnesses who testify during the course of judicial proceedings enjoy quasi-judicial immunity*. This immunity is available to those serving in a quasi-judicial adjudicative capacity as well as those persons other than judges without whom the judicial process could not function. Witnesses who are an integral part of the judicial process are wholly immune from liability for the consequences of their testimony or related evaluations. Statements made during the course of judicial proceedings are absolutely privileged, provided they are relevant, material, or pertinent to the issue being tried. *Falsity or malice on the part of the witness does not abrogate the privilege.* The privilege should be liberally construed so that participants in judicial proceedings are free to express themselves without fear of retaliation. [*Maiden*, 461 Mich at 134 (citations and quotation marks omitted; emphasis added).]

In a similar vein, this Court in *Couch v Schultz*, 193 Mich App 292, 294-295; 483 NW2d 684 (1992), stated:

> In this case, we are concerned with the absolute privilege for statements made during the course of judicial proceedings. Statements made by witnesses during the course of such proceedings are absolutely privileged, provided they are relevant, material, or pertinent to the issue being tried. The immunity extends to every step in the proceeding and covers anything that may be said in relation to the matter at issue, including pleadings and affidavits. The judicial proceedings privilege should be liberally construed so that participants in judicial proceedings are free to express themselves without fear of retaliation. [Citations omitted.]

The immunity or judicial-proceedings privilege extends to statements made by judges, attorneys, and witnesses during the course of judicial proceedings. *Oesterle*, 272 Mich App at 264. The Michigan Supreme Court applied the doctrine in affirming the dismissal of a case involving an action for false imprisonment and assault and battery that arose after the two

defendant doctors opined that the plaintiff required commitment to a hospital and executed supporting certificates that were submitted to the lower court, resulting in an involuntary commitment. *Dabkowski v Davis*, 364 Mich 429; 111 NW2d 68 (1961).

Here, the statements made by Challa to the family court in April 2012 with which Denhof takes offense were relevant, pertinent, and material, and Denhof does not argue otherwise. Rather, Denhof alleged that Challa's statements to the family court constituted misrepresentations and were fraudulent. However, falsity or malice does not abrogate the immunity or privilege. *Maiden*, 461 Mich at 134. Accordingly, quasi-judicial immunity arising from the judicial-proceedings privilege also shielded Challa from liability with respect to the fraud claims.

Denhof argues that quasi-judicial immunity cannot shield Challa from liability for a constitutional violation. However, Denhof did not allege any constitutional claims in his complaint; there were simply three counts of fraud and the single count of obstruction of justice. Denhof further maintains that Challa's conduct constituted gross negligence, thereby precluding the application of quasi-judicial immunity. Denhof, however, did not allege a negligence claim, nor would such a claim have survived Challa's quasi-judicial immunity. Gross negligence pertains to an effort to avoid governmental immunity under MCL 691.1407(2) and has no relevance here.

As touched on by Challa in her summary disposition brief, we voice serious doubts about the soundness of Denhof's allegations and whether a claim for fraud or misrepresentation was even sufficiently pled or could withstand factual scrutiny.[14] However, given our holding on quasi-judicial immunity, there is no need to explore our doubts concerning the viability of Denhof's complaint in regard to the fraud counts.

---

[14] In *Hi-Way Motor Co v Int'l Harvester Co*, 398 Mich 330, 336; 247 NW2d 813 (1976), our Supreme Court enunciated the requisite elements for establishing a fraud claim such as the one pursued by Denhof:

> "The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery." [Citation and quotation marks omitted.]

Denhof's complaint appears problematic when considered in conjunction with the elements that must be pleaded in a fraud action.

With respect to the obstruction of justice count and the alleged destruction of evidence, assuming that immunity does not protect Challa relative to that claim, Denhof entirely fails to address one of the two bases forming the trial court's decision to dismiss the count, which was that a civil cause of action for damages cannot arise out of MCL 750.483a(5). When an appellant fails to dispute the basis of a lower court's ruling, we need not even consider granting the relief being sought by the appellant. *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 381; 689 NW2d 145 (2004). Moreover, Denhof simply failed to state a claim for obstruction of justice, MCR 2.116(C)(8), assuming its general viability, as he failed to allege facts that would adequately support a causal connection between Challa's conduct and actual damages tied to his CSC I convictions. He further failed to allege that Challa lacked legal authority to destroy the 2002 FOC document or that she acted knowingly, assuming actual destruction of the document. See MCL 750.483a(5) (requiring the destruction to be accomplished "knowingly and intentionally").

We now address some other arguments posed by Denhof. He complains that he was not notified of the recusal by the judges of the Ottawa Circuit Court and of the trial court's assignment by SCAO. Assuming this to be true, we fail to see the harm or prejudice in the presumed notice failure, and our refusal to vacate the trial court's opinion and order on this basis is not "inconsistent with substantial justice." MCR 2.613(A) (harmless-error rule). The judges of the Ottawa Circuit Court absolutely took the proper step in recusing themselves, considering Challa's employment with that court, and SCAO appropriately engaged in reassigning the case.

Next, to the extent that Denhof is arguing that reversal is warranted because the trial court was biased, the argument is rejected as entirely baseless. There is absolutely no indication in the record that the trial court was biased in favor of Challa or prejudiced against Denhof, nor was there an appearance of impropriety or a serious risk of actual bias. MCR 2.003(C)(1)(a) and (b). At the hearing on the motions for summary disposition, change of venue, disqualification, and adjournment, the trial court displayed remarkable patience and thoughtfulness in carefully listening to and addressing all of the arguments presented by Denhof regardless of their questionable merit. Essentially, Denhof is dissatisfied with the trial court's ruling on immunity. But "[t]he mere fact that a judge ruled against a litigant . . . is not sufficient to require disqualification[,]" and the trial court's opinion on immunity did not reflect deep-seated favoritism or antagonism. *In re Contempt of Henry*, 282 Mich App 656, 680; 765 NW2d 44 (2009). Denhof fails to overcome the heavy presumption of judicial impartiality. *Id.*

Finally, Denhof argues that summary disposition was premature because discovery had not been completed. Given the legal nature of the quasi-judicial immunity recognized by us today, "there is no fair likelihood that . . . discovery will yield support for the non-moving party's position." *LiParoto Constr, Inc v Gen Shale Brick, Inc*, 284 Mich App 25, 33-34; 772 NW2d 801 (2009). Accordingly, summary disposition was properly granted in favor of Challa.

## III. CONCLUSION

With respect to Denhof's complaint encompassing the three counts of fraud, the trial court did not err in granting summary disposition in favor of Challa, considering that she was shielded from liability on the basis of quasi-judicial immunity. In regard to the claim of obstruction of justice, Denhof fails to address a ground given by the trial court in support of

summary dismissal of that count and, further, Denhof failed to state a claim for obstruction of justice.

Affirmed. Having fully prevailed on appeal, Challa is awarded taxable costs pursuant to MCR 7.219.

/s/ William B. Murphy
/s/ Jane E. Markey
/s/ Cynthia Diane Stephens