# STATE OF MICHIGAN

# COURT OF APPEALS

PAULA DOWKER,

Plaintiff-Appellant,

v

RICHMOND COMMUNITY SCHOOLS,
RICHMOND COMMUNITY SCHOOL
DISTRICT BOARD OF EDUCATION, and
BRIAN J. WALMSLEY,

Defendants-Appellees.

UNPUBLISHED
September 11, 2018

No. 336964
Macomb Circuit Court
LC No. 2015-002315-CD

Before: CAMERON, P.J., and RONAYNE KRAUSE and TUKEL, JJ.

PER CURIAM.

Plaintiff appeals as of right the trial court's opinion and order granting summary disposition in favor of defendants, Richmond Community Schools, Richmond Community School District Board of Education, and Brian J. Walmsley (hereinafter "defendants" collectively), in this wrongful termination employment case brought pursuant to the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq*. We affirm.

Plaintiff was hired in January 2015 as principal of Will E. Lee Elementary School in the Richmond Community School District. Defendant Walmsley was then, and remains, the Superintendent of the Richmond Community School District. Upon her termination in May of 2015, Defendant filed a complaint alleging violation of the WPA for reporting misuse of Title I funds, public policy wrongful discharge, breach of just cause employment based on negotiations with defendant Walmsley, and tortious interference with contractual relations by defendant Walmsley. Plaintiff subsequently withdrew her claims for public policy wrongful discharge and tortious interference.

Plaintiff alleged that her termination as principal was the result of trying to implement defendant Walmsley's unpopular agenda for school improvement. Plaintiff argued that she was a mere scapegoat, and that once the changes proved to be largely unpopular defendant Walmsley solicited complaints from teachers and parents in order to justify her removal. Plaintiff further alleged that any misrepresentations on documents made when she was hired were simple error on her part by mistakenly signing documents in the wrong spot. Plaintiff's WPA claims hinge on her allegation that she discovered possible misuse of Title I funds which led directly to her

-1-

termination. Defendant claims she was unable to meet directly with defendants and therefore met with Anthony Birkmeier, director of curriculum, to discuss the possible misuse. Plaintiff then acted personally to ensure compliance by removing the high performance students from the E-Sparks program and claims that she requested that Heidi Napier, Title I coordinator, then inform the parents of those students of the changes. Finally plaintiff alleged that certain affidavits filed by defendants were improper as they were not signed in the presence of a notary and were not based on personal knowledge.

Defendants counter plaintiff's allegations with extensive documentation of reported misconduct by plaintiff. Defendants point to numerous complaints from teachers, parents, and professional staff about plaintiff's behavior and communication style, describing plaintiff as distant and dictatorial in her conduct. Defendants also allege that plaintiff inappropriately and unilaterally altered an individualized educational plan (IEP) for a special education student, and that she falsified documents related to her hiring that, had they contained accurate information, would have caused defendants to not offer her employment in the first instance. Defendant also alleged plaintiff committed insubordination by failing to conduct regular classroom visits and teacher evaluations and by refusing to send home a letter composed by defendant Walmsley attempting to inform parents of some of the ongoing changes at the school, that plaintiff inappropriately implemented defendant Walmsley's directives to the detriment of students and teachers, and finally that plaintiff did not properly consult with defendants regarding the Title I issues, acted unilaterally to implement changes, and was unaware of the plans of defendants to ensure compliance moving forward.

The trial court granted Defendants motion for summary deposition, finding that plaintiff's employment was governed by a Collective Bargaining Agreement (CBA) and therefore could not be individually negotiated and that plaintiff had failed to establish a prima facie case between any protected activity and her termination.

## I. WRONGFUL DISCHARGE CLAIMS

Plaintiff asserts the trial court erred in granting summary disposition in favor of defendants with regard to plaintiff's claims of breach of contract and wrongful termination premised on the WPA. Plaintiff contends that she established a prima facie case and that defendants' explanations for her discharge were pretextual. Specifically, plaintiff alleges that her discharge was premised on her reporting of a violation regarding the misuse of Title I funds by defendants. In support of her position, plaintiff references a heated exchange with the school district Superintendent Brian J. Walmsley and the temporal proximity of her discharge to her reporting of the wrongful conduct. Plaintiff also asserts that her discharge was simply a means for Walmsley to position her to be the scapegoat for defendants' unpopular policy changes within the school. Plaintiff contends that her breach of contract claim was premised on verbal assurances provided by Walmsley and not on the collective bargaining agreement (CBA), thereby obviating the requirement for her exhaustion of remedies.

"This Court reviews de novo 'a trial court's decision to grant or deny summary disposition.' " *Meisner Law Group PC v Weston Downs Condo Ass'n*, 321 Mich App 702, 713; 909 NW2d 890 (2017) (citations omitted). Defendants' motion for summary disposition was filed pursuant to MCR 2.116(C)(4), (7), (8) and (10). Although the trial court did not specify

under which provision of MCR 2.116(C) it was granting summary disposition in favor of defendants, based on the trial court's consideration of documents and evidence outside the pleadings, the applicable standards of review are MCR 2.116(C)(4), (7) and (10).

As explained by this Court:

MCR 2.116(C)(4) permits a trial court to dismiss a complaint when "[t]he court lacks jurisdiction of the subject matter." A motion under Subrule (C)(4) may be supported or opposed by affidavits, depositions, admissions, or other documentary evidence. MCR 2.116(G)(2). When affidavits, depositions, admissions, or other documentary evidence are submitted with a motion under MCR 2.116(C)(4), they "must be considered by the court." MCR 2.116(G)(5). [*Id.*]

In turn:

MCR 2.116(C)(7) provides for summary disposition when a claim is barred because of . . . immunity granted by law . . . The movant may submit affidavits, depositions, admissions, or other documentary evidence in support of the motion if the evidence is substantively admissible. The contents of the complaint are accepted as true unless contradicted by the evidence provided. This Court must consider the documentary evidence in the light most favorable to the nonmoving party for purposes of MCR 2.116(C)(7). [*Denhof v Challa*, 311 Mich App 499, 510-511; 876 NW2d 266 (2015) (citations, quotation marks and brackets omitted).]

"A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. When evaluating a motion for summary disposition under MCR 2.116(C)(10), a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties . . . in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law." *Innovation Ventures v Liquid Mfg*, 499 Mich 491, 507; 885 NW2d 861 (2016) (citations and quotation marks omitted).

## A. BREACH OF CONTRACT

Plaintiff's employment was subject to an administrative contract with defendants that was governed by a CBA. Article X of the contract outlines the grievance procedure. A grievance is defined as "any disagreement between the Board of Education and one or more of the employees represented by the Association as to the interpretation, application, or alleged violation of any provisions of this agreement." It requires that "[a]ll grievances shall be settled in accordance with the grievance procedure," as outlined below:

Step 1: Any employee having a grievance shall first take up the matter with his immediate supervisor . . .

Step 2: The written grievance shall be presented to the Superintendent for his review . . .

-3-

Step 3: In the event the grievance is not satisfactorily settled in Step 2, the Association may request that the grievance be submitted to the Board of Education for its consideration . . .

Step 4: If the Association is not satisfied with the disposition made by the Board, the grievance, at the option of the Association, may be referred for arbitration to the American Arbitration Association, in writing, and request the appointment of an arbitrator to hear the grievance . . .

Vernon Keith Bartels, who served as a middle school principal for defendants and the union representative for plaintiff, testified during his deposition that the union did pursue a grievance on behalf of plaintiff, but elected not to proceed to step 4.

Plaintiff's assertion that her breach of contract claim is premised on verbal representations or assurances made by Walmsley regarding just cause termination during her hiring process, notwithstanding the CBA, is misplaced. The union or association did not represent plaintiff in her hiring negotiations or in obtaining her employment contract, and the language of the CBA precludes consideration of any prior or individual agreements. As recognized in *Morris Pumps v Centerline Piping, Inc*, 273 Mich App 187, 194; 729 NW2d 898 (2006) (citations and quotation marks omitted), "a contract will be implied only if there is no express contract covering the same subject matter. Generally, an implied contract may not be found if there is an express contract between the same parties on the same subject matter." Based on the existence of a written contract in the form defined by the CBA, plaintiff's contentions regarding verbal negotiations during the hiring process cannot be used to establish her breach of contract claim.

In general, with regard to contracts governed by a CBA, "an employee may not maintain an action against his employer for breach of a collective bargaining agreement unless he [or she] has exhausted his [or her] contractual grievance procedures." *Sankar v Detroit Bd of Ed*, 160 Mich App 470, 474; 409 NW2d 213 (1987). Plaintiff is asserting that the rights violated by defendants were those of "just cause" termination under the CBA. This Court has affirmed that when a plaintiff is seeking a remedy created by a labor contract that the rule of exhaustion is applicable. *Id*. at 475.

Arguably, plaintiff has pursued, to the extent available to her, the exhaustion of the administrative remedies under the CBA. According to Bartels, the union did pursue a grievance, but elected to not continue the grievance process once it reached the arbitration phase. Plaintiff does not, however, assert that the association breached its duty of fair representation in failing to pursue her grievance through to arbitration.

"A union has considerable discretion to decide which grievances shall be pressed to arbitration and which shall be settled, and must be permitted to assess each grievance with a view to individual merit." *Knoke v East Jackson Pub Sch Dist*, 201 Mich App 480, 486; 506 NW2d 878 (1993). "The union may consider the good of the general membership and has discretion to weigh the burden on the contractual grievance machinery, the amount at stake, the likelihood of success, the cost, and the desirability of winning the award against considerations that affect the membership as a whole." *Id*. Plaintiff is unable to pursue a breach of contract

claim against defendants unless she can demonstrate a claim of breach of the duty of fair representation with regard to the association or union. *Id*. at 485. Therefore, the grant of summary disposition was appropriate based on plaintiff's failure to state a claim for breach of the duty of fair representation. A trial court's ruling may be upheld on appeal when the correct result is reached, albeit for the wrong reason. *Gleason v Mich Dep't of Transp*, 256 Mich App 1, 3; 662 NW2d 822 (2003).

In addition, amendments to the Public Employment Relations Act (PERA), MCL 423.215(3)(m), now state, in relevant part:

> For public employees whose employment is regulated by 1937 (Ex Sess) PA 4 [the Teacher Tenure Act], MCL 38.71 to 38.191, a public school employer shall not adopt, implement, or maintain a policy for discharge or discipline of an employee that includes a standard for discharge or discipline that is different than the arbitrary and capricious standard provided under section 1 of article IV of 1937 (Ex Sess) PA 4, MCL 38.101.

A "teacher" is defined as "a certificated individual employed for a full school year by any board of education or controlling board." MCL 38.71(1). In turn, "[t]he term 'certificated' means holding a valid teaching certificate . . . an individual is considered to be holding a valid teaching certificate if the individual has on file with his or her employing school district . . . an appropriate teaching certificate issued by the state board of education[.]" MCL 38.72. Plaintiff acknowledged in her deposition that she is a certified teacher. As such, plaintiff falls within these provisions, making her subject to the arbitrary and capricious standard, despite the language of the CBA. See *Mino v Clio Sch Dist*, 255 Mich App 60, 71; 661 NW2d 586 (2003) (finding that a contract that violates a statute is void and cannot be enforced).

Our Supreme Court defined the terms "arbitrary" and "capricious" in *Goolsby v Detroit*, 419 Mich 651, 678; 358 NW2d 856 (1984):

> Arbitrary is: [Without] adequate determining principle . . . Fixed or arrived at through an exercise of will or by caprice, without consideration or adjustment with reference to principles, circumstances, or significance, . . . decisive but unreasoned.
>
> Capricious is: [Apt] to change suddenly; freakish; [or] whimsical . . . [Citations and quotation marks omitted.]

Defendants' determination to terminate plaintiff's employment cannot be construed to be arbitrary or capricious given the number of complaints and problems documented and verified regarding plaintiff's performance as a principal. Further, defendants met the higher standard of just cause based on plaintiff's insubordination. It has previously been recognized "that a consistent pattern of violation of rules and regulations which were clearly within the powers of the school administration showed persistent insubordination to proper authority and could be presumed to have an adverse effect on the students, teachers and staff of a school." *Sutherby v Gobles Bd of Ed*, 132 Mich App 579, 585; 348 NW2d 277 (1984). Hence, "insubordination may constitute reasonable and just cause for discharge[.]" *Lakeshore Pub Schs Bd of Ed v Grindstaff,*

436 Mich 339, 345; 461 NW2d 651 (1990). As such, dismissal of plaintiff's breach of contract claim by the trial court did not constitute error.

## B. WHISTLEBLOWER CLAIMS

Plaintiff contends that her discharge was attributable to her reporting of the misuse of Title I funds. She further asserts that her refusal to misrepresent or falsify teacher evaluations regarding level of competency or performance was also a factor in her discharge.

In accordance with the WPA, MCL 15.362:

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

For purposes of this action, a "public body" is defined as "[a] county, city, township, village, intercounty, intercity, or regional governing body, a council, school district, special district, or municipal corporation, or a board, department, commission, council, agency, or any member or employee thereof." MCL 15.361(d)(*iii*). In accordance with *Shaw v Ecorse*, 283 Mich App 1, 8; 770 NW2d 31 (2009):

To establish a prima facie case under this statute, a plaintiff must show that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action. If a plaintiff is successful in establishing a prima facie case under the WPA, the burden shifts to the defendant to establish a legitimate business reason for the adverse employment action. Once the defendant produces such evidence, the plaintiff has the burden to establish that the employer's proffered reasons were a mere pretext for the adverse employment action. [Citations and quotation marks omitted.]

The trial court determined that defendants were entitled to summary disposition because plaintiff failed to establish a prima facie case under the WPA. Specifically, the trial court found that plaintiff did not demonstrate "a causal connection between any protected activity and the termination of her employment." In addition, the trial court found that "no reasonable juror could infer from the evidence presented that plaintiff's report of Defendant Richmond Community Schools' misuse of Title I funds constituted a motivating factor in defendants' decision to terminate her employment because there is no evidentiary support for a finding that defendants knew that she had made such a report." The trial court indicated that the testimony of Anthony Birkmeier, as relied on by plaintiff to establish her reporting of a violation of law, failed

to support her assertion and that "[t]here is no evidence in the record to suggest that either Defendant Walmsley or Defendant Richmond Community Schools knew that plaintiff reported the misuse of Title I funds."

"An employee is engaged in protected activity under the Whistleblowers' Protection Act who has reported, or is about to report, a suspected violation of law to a public body." *Shallal v Catholic Social Servs of Wayne Co*, 455 Mich 604, 610; 566 NW2d 571 (1997). The Richmond Board of Education President, Margaret E. Teltow, averred: "I'm aware Ms. Dowker alleges she was terminated for reporting a misuse of Title I funds. She wasn't. Ms. Dowker did not make any such complaint to the Board and it was not part of the reason we voted to terminate her employment." Walmsley also denied having been informed of the misuse of funds until parents voiced complaints at a school board meeting regarding the removal of their children from a program without notice. However, the deposition testimony of Birkmeier relied on by plaintiff, but discounted by the trial court, to demonstrate plaintiff's engagement in a protected activity comprises a closer call.

During his deposition, Birkmeier concurred that plaintiff "questioned whether or not we could have accelerated students" in a program involving Title I funds. Birkmeier indicated he would look into the matter, noting that the practice in question had been evaluated under a state audit, with the district receiving "praise[ for] the way that we had run our Title I program." After speaking with other individuals and receiving conflicting opinions, Birkmeier indicated to plaintiff that some confusion may have occurred based on the school previously having Title I Part G funds, which are designed for "gifted students," but that "currently" the funds "probably should not be [used] for accelerated students." Birkmeier acknowledged that he spoke with Walmsley to suggest "we should probably look into another solution" for accelerated students. Birkmeier understood that accelerated students would be phased out of the program, but that an alternative means to provide services to the accelerated students would be determined and implemented. Birkmeier indicated that "eSpark itself could be used for both accelerated and non-accelerated students. It's a matter of how we pay for the eSpark." He further asserted that the iPads purchased with Title I funds could be used by general education students when not being used for Title I purposes pursuant to a letter received from the state auditor. As such, although plaintiff inquired regarding the use of Title I funds, it was Birkmeier who investigated the matter, consulted with Walmsley and determined that an alternative funding mechanism was necessary. Birkmeier was not concerned that the school would lose funding because of the issue, believing that because it was early in the onset of implementation that the school would be permitted "to make a correction before they would pull funding." While plaintiff may have mischaracterized her inquiry into the propriety of the use of Title I funds to equate with an actual reporting of their misuse, her inquiry could still be construed as having engaged in a protected activity. Under the WPA, MCL 15.362, an employee falls within the purview of the statute if "the employee . . . reports or is about to report, verbally or in writing, a violation or *a suspected violation* of a law or regulation . . . " (Emphasis added.) Thus, the trial court's determination that plaintiff was not involved in a protected activity is questionable.

We note, however, that during plaintiff's deposition, she also asserted informing Walmsley of the misuse of Title I funds in a meeting on March 18, 2015, that included her union representative Keith Bartels. Yet, in her response to defendants' motion for summary disposition and on appeal, plaintiff does not assert having reported this alleged violation regarding the use of

Title I funds to anyone other than Birkmeier. Walmsley has denied the reporting of the alleged violation by plaintiff and has asserted that he first learned of the issue pertaining to the Title I funds at a School Board meeting when parents began to complain that their children had been removed, without notice, from a school program.

In addition, even if plaintiff was engaged in a protected activity, plaintiff is unable to establish the existence of a causal connection between her alleged protected activity and her discharge, other than temporal contiguity. As recognized by this Court:

> A plaintiff may establish a causal connection through either direct evidence or indirect and circumstantial evidence. Direct evidence is that which, if believed, requires the conclusion that the plaintiff's protected activity was at least a motivating factor in the employer's actions. To establish causation using circumstantial evidence, the "circumstantial proof must facilitate reasonable inferences of causation, not mere speculation." Speculation or mere conjecture "is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference." In other words, the evidence presented will be sufficient to create a triable issue of fact if the jury could reasonably infer from the evidence that the employer's actions were motivated by retaliation. [*Shaw*, 283 Mich App at 14-15 (citations omitted).]

"A temporal connection between protected activity and an adverse employment action does not, in and of itself, establish a causal connection, but it is evidence of causation." *Id*. at 15 (citation omitted).

Plaintiff's primary assertion is that she was suspended, and ultimately discharged, shortly after reporting the misuse of Title I funds and that Walmsley verbally denigrated her within this time frame. Walmsley has not denied losing his temper with plaintiff, but asserted it was in conjunction with her insubordination in refusing to disseminate a letter to students' families and not the alleged reporting of misuse of the Title I funds. The vast majority of the evidence suggests that plaintiff's job performance was problematic in that she was alienating staff, intimidating students at the school and upsetting parents. If a plaintiff is successful in establishing a prima facie case, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision." *Campbell v Human Servs Dep't*, 286 Mich App 230, 241; 780 NW2d 586 (2009). "The plaintiff, for his or her claim to survive following such an articulation by the employer, must then demonstrate that the articulated reason was merely a pretext for unlawful discrimination." *Id*. Specifically:

> A plaintiff can establish that a defendant's articulated legitimate, nondiscriminatory reasons are pretexts (1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision. [*Id*. (citation omitted).]

"It is insufficient for a plaintiff to 'simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the

employer, not whether the employer is wise, shrewd, prudent, or competent.' " *Id*. (citation omitted).

Multiple staff contacted Walmsley to express their concerns and dissatisfaction with plaintiff's leadership and the changes being implemented at the school. It is undisputed that numerous parents attended the March 2015 School Board meeting to voice complaints pertaining to plaintiff. It is also undisputed that Walmsley instructed plaintiff to send to the homes of all the children enrolled in the elementary school the April 2, 2015 letter, detailing the concerns that had been expressed and how defendants were addressing those issues, but that plaintiff refused to send the letter out as directed, despite her union representative confirming that such a denial could be construed as insubordination.

Defendants came forward with a plethora of evidence to demonstrate concerns regarding plaintiff's effectiveness, including: the further reduction in morale among staff since plaintiff's hiring, issues regarding plaintiff's quality of interaction with students at the school, and the voicing of complaints among parents of students in the community regarding plaintiff's performance and actions. Plaintiff admittedly was insubordinate in failing to follow the directives of Walmsley regarding the dissemination of the April 2, 2015 letter and in failing to complete required classroom walkthroughs and teacher evaluations. As such, defendants have provided sufficient justifications for their action in terminating plaintiff's employment. The aforementioned justifications are completely devoid of any relationship between the decision to terminate and plaintiff's alleged engagement in a protected activity. Plaintiff has not established that a jury could conclude the myriad of concerns cited by defendants constituted mere pretext.

With specific reference to plaintiff's claim that defendants were motivated by animus due to her reporting of Title I fund misuse, it is relevant to note that the April 2, 2015 letter addressed this issue. This suggests that defendants acknowledged the error in misuse of the funds, indicated a concern for the students removed without prior explanation from an educational program, and an intention to maintain compliance with Title I restrictions:

> *Did the advanced math program through e-Sparks get eliminated for students?*
>
> Yes. Last summer, Lee Elementary School used their Title I funds to purchase e-Sparks to use with identified Title I students. Title I is a federally funded program that provides supplemental support services for students who are at-risk of not meeting state standards. However, due to a variety of reasons, e-Spark was also being used with accelerated students.
>
> While e-Sparks is a wonderful program for both at-risk and accelerated students, a decision was made by Mrs. Dowker to remove accelerated students from the e-Sparks program without my knowledge. While I understand the decision was made to maintain the district compliance with the use of Title I funds, we did not have a systemic plan to support those students removed from e-Sparks. As you have heard me say, *guaranteed learning for all students* is our focus.
>
> Therefore, the e-Sparks program for accelerated students will be reinstated after Spring break. Students who were removed from the program will receive a letter

from Mrs. Dowker about their reinstatement. Let me assure you, the district will remain in compliance and no Title I funds will be utilized to support the program for accelerated students.

This statement is consistent with defendants' position that revelations regarding the misuse of the Title I funds were not a concern or a factor in plaintiff's discharge. Plaintiff's discharge was a direct result of her failure to communicate, her removal of children from a program without first informing defendants and the parents of students affected by this decision, and failing to take steps to assure that relevant services would continue to be provided, albeit through a different funding mechanism. "The fact that a plaintiff engages in a 'protected activity' under the Whistleblowers' Protection Act does not immunize him from an otherwise legitimate, or unrelated, adverse job action." *West v Gen Motors Corp*, 469 Mich 177, 187; 665 NW2d 468 (2003).

Evidence was also introduced indicating that plaintiff was required to routinely perform classroom walkthroughs in preparation to complete teacher evaluations, but only completed 11 walkthroughs in approximately three months. While plaintiff contends that, in part, her discharge stemmed from her refusal to falsify teacher evaluations by indicating competence where she did not believe it was demonstrated by certain educators in her building, defendants assert that plaintiff's failure to conduct the walkthroughs called into question the accuracy of the few evaluations she had completed. Defendants also note plaintiff's insubordination in purposefully declining to perform functions knowingly required of her position. Regardless, plaintiff's refusal to complete teacher evaluations does not comprise a protected activity for purposes of a whistleblower claim because it does not entail the reporting of a violation of the law. *Shallal*, 455 Mich at 610. As a related matter, plaintiff also suggested that Walmsley was using plaintiff to shield himself from criticism for the implementation of unpopular policies or actions. Such a claim does not comprise, or even suggest, plaintiff's engagement in a protected activity. Rather, through these allegations, plaintiff is suggesting a more common claim of retaliatory or wrongful discharge, which was not pleaded, and therefore is not properly before this Court.

## II. ADMISSIBILITY OF EVIDENCE – AFFIDAVITS

Plaintiff's presentation of this issue on appeal comprises an assertion that the trial court erred by admitting into evidence certain affidavits submitted by defendants because they were not properly signed before a notary public. Within the factual and procedural section of her appellate brief, plaintiff asserts that several of the affidavits submitted by defendants were invalid because they were not made under oath or signed in the presence of a notary public. She specifically argues that Sheri Westerhof's affidavit is contrary to Westerhof's deposition testimony wherein she acknowledged that some of the allegations within her affidavit were not based on personal knowledge.

To preserve a challenge to the admission of evidence for appellate review, a litigant must object to the evidence in the trial court on the same basis that is asserted on appeal. MRE 103(a)(1); *Klapp v United Ins Group Agency, Inc (On Remand)*, 259 Mich App 467, 475; 674 NW2d 736 (2003). Cursorily, plaintiff asserted that certain affidavits submitted by defendants in the trial court were invalid because they lacked proper authentication by a notary public.

Plaintiff did not provide any extended discussion or citation to authority regarding her claim of error, did not raise or argue the purported concerns with the affidavits during oral argument before the trial court, and the trial court did not address the assertion or provide any indication that the affidavits were a consideration in its ruling. The issue is not, therefore, preserved for appellate review.

In accordance with *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 604; 886 NW2d 135 (2016):

> Issues relating to the admission of evidence are reviewed for an abuse of discretion. An abuse of discretion generally occurs only when the trial court's decision is outside the range of reasonable and principled outcomes, but a court also necessarily abuses its discretion by admitting evidence that is inadmissible as a matter of law. [Citations omitted.]

"This Court reviews unpreserved evidentiary issues, however, for 'plain error affecting [a party's] substantial rights.' " *Lenawee Co v Wagley*, 301 Mich App 134, 164-165; 836 NW2d 193 (2013) (citation omitted). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Kern v Blethen-Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000) (citation and internal quotation marks omitted). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App 1, 9; 761 NW2d 253 (2008).

In plaintiff's brief response to defendants' motion for summary disposition, plaintiff made the same assertions, almost verbatim, to those argued on appeal. Other than her assertions and references to the affidavits attached to her response, plaintiff provided no legal authority or citation to case law in the trial court to support her allegations. Plaintiff did not raise or discuss this concern during the hearing on defendants' motion for summary disposition. In its ruling, the trial court did not address plaintiff's stated concerns regarding the validity of the identified affidavits. It is also clear from the trial court's ruling that it did not rely on the allegedly defective affidavits in its decision to grant defendants' motion for summary disposition.

As has been routinely and frequently recognized by this Court:

> An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give issues cursory treatment with little or no citation of supporting authority. An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue. [*Houghton ex rel Johnson v Keller*, 256 Mich App 336, 339-340; 662 NW2d 854 (2003) (citations omitted).]

Based on plaintiff's cursory assertions, her failure to provide any legal authority or relevant discussion of this issue and the absence of any indication that the trial court either considered or based its ruling on the challenged affidavits, the issue is deemed abandoned. See *City of Riverview v Sibley Limestone*, 270 Mich App 627, 638; 716 NW2d 615 (2006) ("Although there

-11-

are instances in which a reviewing court may overlook preservation requirements, a party's failure to brief an issue that necessarily must be reached precludes appellate relief.").

For thoroughness, however, this Court notes the following. First, plaintiff contends the trial court erred in admitting evidence obtained after plaintiff's discharge indicating she engaged in misconduct in her prior position with National Heritage Academy (NHA). Notably this assertion is not identified in the statement of the issues on appeal as set forth by plaintiff in her appellate brief as required by MCR 7.212(C)(5). In addition, this issue was not decided by the trial court and this Court's "review is limited to issues actually decided by the lower court." *Preston v Dep't of Treasury*, 190 Mich App 491, 498; 476 NW2d 455 (1991).

Second, plaintiff does not identify the affidavits challenged by name of the affiant, indicating for three of the four affidavits only their exhibit number in reference to defendants' motion for summary disposition in the trial court. With regard to the three affidavits identified in this manner, plaintiff asserts that the affidavits "were not given under oath and were not signed before a notary." Plaintiff does not cite to any evidence regarding the three specific affidavits in support of her contention other than the deposition testimony of the fourth affiant, Westerhof, and an exhibit that defines a notary. With regard to the Westerhof affidavit, plaintiff asserts that Westerhof admitted to lacking personal knowledge with regard to certain allegations contained in her affidavit and that she did not sign the affidavit in the presence of a notary. At her deposition, when asked to identify the individuals present when she signed her affidavit, Westerhof failed to name the notary. Subsequently, when asked if she was present when plaintiff made the comment describing the elementary school as the "next Columbine," Westerhof acknowledged that she learned about the comment "from other staff members." In her affidavit, Westerhof stated: "7. Ms. Dowker would refer to our school as the 'next Columbine,' which was troubling." While Westerhof did not personally hear this comment from plaintiff, other individuals did testify to being present when plaintiff made the statement. Westerhof signed the affidavit, indicating the document was "based upon personal information, knowledge, and belief." This appears to confuse the verification requirements for a pleading with those of an affidavit. Specifically:

> [T]he requirements regarding the form of verification for a pleading and the form of an affidavit are significantly different. For example, a pleading may be verified merely by the declaration that the statements in the pleading are true and accurate to the best of the signer's information, knowledge and belief, MCR 2.114[B](2)(b) [sic], whereas an affidavit filed in support of a motion must be made on personal knowledge, stating with particularity facts admissible as evidence establishing the grounds stated in the motion and showing affirmatively that the affiant, if sworn as a witness, can testify competently to the facts stated in the affidavit, MCR 2.119(B)(1). [*Miller v Rondeau*, 174 Mich App 483, 487; 436 NW2d 393 (1988) (footnote omitted).]

Even if construed as defective and improperly submitted, however, it is significant that in making its ruling, the trial court never referenced any of the affidavits provided by defendants, other than the affidavit of the Richmond Community School's Board of Education President,

Margaret E. Teltow, which plaintiff has not challenged, and that the comment cited by plaintiff was verified by other sources. As such, we deem any error in the submission of the Westerhof affidavit to be harmless. The defendants having prevailed in full, may tax costs.

Affirmed.

/s/ Thomas C. Cameron
/s/ Amy Ronayne Krause
/s/ Jonathan Tukel