*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ADASENY HUMPHREY,

      Plaintiff-Appellant,

v

MARCEL A. FLORES,

      Defendant-Appellee.

UNPUBLISHED
September 21, 2023

No. 364379
Saginaw Circuit Court
LC No. 21-043921-NI

Before: HOOD, P.J., and REDFORD and MALDONADO, JJ.

PER CURIAM.

Plaintiff, Adaseny Humphrey, appeals by right the trial court's order granting summary disposition in favor of defendant, Marcel A. Flores, under MCR 2.116(C)(10). Plaintiff alleged that she suffered a serious impairment of body function as a result of a February 27, 2018 motor-vehicle accident in which defendant was allegedly at fault. The trial court rejected defendant's request for summary disposition, at least in part, with respect to whether plaintiff suffered an impairment that was objectively manifested, but the court also found as a matter of law that plaintiff's impairment did not affect her general ability to lead her normal life. On appeal, plaintiff argues that the trial court erred in its ruling because the court failed to recognize that there is no durational or temporal requirement in establishing a serious impairment of body function. Defendant maintains that the evidence did not support a determination that plaintiff's general ability to lead her normal life was affected. As an alternative basis to affirm the trial court's ruling, defendant additionally contends that plaintiff failed to produce any evidence of an objectively manifested impairment and that the trial court erred by finding otherwise. We affirm.

## I. BACKGROUND

Before we discuss the accident giving rise to this lawsuit, we briefly address plaintiff's medical history before the accident took place as reflected in documentary evidence presented by defendant. Beginning on November 1, 2012, plaintiff began treatment at Preferred Chiropractic. Her intake form indicated that plaintiff had various areas of pain that she believed were caused by a motor-vehicle accident that had occurred four to five years earlier when a "business vehicle" ran a red light and struck her car. Plaintiff informed the chiropractor that she had lower back pain that

-1-

was made worse when sitting, that she also had pain in her sacroiliac joints, cervical spine, midback, and neck, and that she had frequent headaches. But she also revealed that the pain only had a marginal impact on her daily living activities, including lifting heavy objects, although she mentioned that pain prevented her from sitting for more than one hour. The initial diagnosis included nonallopathic lesions of the lumbar region, lumbar facet syndrome, myofascitis, nonallopathic lesions of the sacral region, abnormal posture, nonallopathic lesions of the pelvic region, lumbar spine pain, nonallopathic lesions of the cervical region, headache, cervicalgia, nonallopathic lesions of the thoracic spine, and thoracic spine pain.

Undergoing multiple chiropractic adjustments during each visit, plaintiff treated at Preferred Chiropractic on a regular basis for the remainder of 2012 and on a sporadic basis in 2013. There are no chiropractic documents for 2014, and 2015 reports from Preferred Chiropractic show several visits by plaintiff in late January and early February. There is no documentation of chiropractic visits thereafter. The final February 2015 chiropractor report indicated that plaintiff was still complaining of pain in her lower back, sacroiliac joints, neck, and midback, along with headaches. The diagnosis was nearly identical with that made in 2012.

As gleaned from a traffic crash report, on February 27, 2018, plaintiff was driving southbound through an intersection when defendant, who was traveling northbound, allegedly failed to yield the right-of-way at the intersection and turned left directly into the path of plaintiff's car, striking the driver's side of plaintiff's vehicle. The crash report indicated that defendant was "at fault for not yielding when making the left turn."[1] According to the report, plaintiff was wearing her seatbelt, her airbag deployed, she was transported to Covenant Medical Center for a "possible injury," and both vehicles sustained "disabling damage" and were towed.

The ambulance company's patient-care report noted that plaintiff complained of pain in her left shoulder, elbow, wrist, and arm and that there were "[n]o obvious signs of abrasions, contusions or abnormalities." A hospital emergency room (ER) report revealed a diagnosis of "[s]prain of left wrist." Plaintiff told ER personnel that she had "left hand pain, a left hand wound, left elbow pain, left shoulder pain, pain across her chest, mild right knee pain and mild abdominal pain." The ER report indicated that there was tenderness and swelling of and an abrasion to plaintiff's left hand, tenderness of her left elbow, and "[m]ild tenderness with range of motion of the wrist." X-rays of plaintiff's left hand and wrist revealed "no fractures, dislocations, or destructive osseous processes." X-rays of plaintiff's left shoulder identified "normal bone density and articulation[,]" "no fracture or subluxation[,]" and normal "[a]cromiohumeral distance." Finally, x-rays of plaintiff's left elbow depicted "normal bone density and articulation[,]" "[n]o fracture or subluxation[,]" and "no joint effusion or soft tissue swelling." Plaintiff testified that her arm was placed in a sling, that she obtained a brace for her wrist, and that she was discharged.

---

[1] Plaintiff testified in her deposition that she had a green light when she entered the intersection and that defendant had a blinking yellow light. Defendant, on the other hand, testified that he was in the middle of the intersection when he had to turn, that his light was red at that point, that plaintiff's light was also red when she drove through the intersection, and that he was never ticketed.

On March 8, 2018, plaintiff visited a different hospital's ER, complaining of left index finger, neck, head, and lower back pain, along with neck stiffness. On March 28, 2018, there were x-rays taken of plaintiff's lumbar and thoracic spine, which showed no fractures or abnormalities. On April 2, 2018, plaintiff followed up by seeing an orthopedic surgeon regarding ongoing left wrist pain. The report generated by the visit noted that plaintiff had worn a splint or brace and a sling for three weeks after the accident. The orthopedist indicated that on physical examination of plaintiff, he found that there were no deformities or breaks to the skin of the left wrist, that there was "[u]lnar sided wrist pain with supination," that there was "[n]o pain over the distal radius," that there was "[g]ood wrist flexion and extension," that there was "[t]ender[ness] over the distal ulna," that "[m]ost of her pain is over the head of the ulna," and that there was "[f]ull elbow range of motion." The orthopedist noted a contusion of the left wrist, and further observed:

> Her wrist pain should continue to improve over the next month. If her pain does not improve in the next 4 weeks, an MRI of her left wrist will be ordered. Encouraged patient to perform wrist and shoulder strengthening and range of motion exercises daily. Patient is agreeable to this treatment plan.

The orthopedist stated that "AP and lateral views of the left wrist were ordered, obtained, and interpreted by me in the office today, and show[] no evidence for fracture, malalignment, or acute boney abnormality."

On June 12, 2018, another lumbar spine x-ray was performed, producing findings and impressions of "no fractures or degenerative changes[,]" "no spinal cysts[,]" "very mild thoracolumbar scoliosis[,]" "mild lumbar scoliosis[,]" and "[n]ormal vertebral body heights and disc spaces." On April 17, 2019, an independent medical examination (IME) was performed by Dr. Kevin Orloski. Plaintiff ultimately relies on aspects of Dr. Orloski's IME report. In his report, Dr. Orloski discussed plaintiff's symptoms since the accident, as conveyed to him by plaintiff:

> The patient states she has neck pain and stiffness that is 60 percent improved. The pain does not radiate to her arms. She denies a previous history of neck pain. She also reports back pain that has not improved. It is a constant pain at 6/10. It does not radiate to either leg. She denies a previous history of back pain. She also reports left wrist pain with associated coldness, numbness and tingling in the hand. She also reports left shoulder pain. She has not had any injections or other procedures to the shoulder and denies a previous history of shoulder pain. She is currently undergoing physical therapy.

In his IME report, Dr. Orloski summarized, in part, documents concerning medical treatment and services received by plaintiff that were not submitted in connection with the summary disposition motion. He referred to a magnetic resonance imaging (MRI) of plaintiff's left wrist that was performed on June 2, 2018, which showed no fracture. But it did reveal a "diffuse marrow edema of the distal radius suggesting a contusion[,]" and "[i]t also showed a thin layer of fluid at the scapholunate joint, which is possibly from a possible partial thickness tear of the scapholunate ligament." Dr. Orloski noted that plaintiff had participated in physical and occupational therapy during the summer of 2018. Regarding his impressions, Dr. Orloski found

that there were no objective findings with respect to plaintiff's subjective complaints of neck, back, and left shoulder pain.[2] He did, however, also find:

> Left wrist contusion/sprain. The patient had an MRI of the wrist, which suggested a sprain and contusion. The patient had extensive therapy. Injuries such as these tend to resolve within three to four months, at most. On current examination the wrist joint is intact. There is no ligamentous instability or deformity. Range of motion is intact and motor strength is intact. There are no positive objective findings to suggest any ongoing injury to the left wrist.

It was Dr. Orloski's opinion that currently there was "no disability related to any injuries sustained in the motor vehicle accident in question." He believed that plaintiff was "able to complete activities of daily living, work activities, household activities, personal care activities and driving without restriction." Dr. Orloski added that plaintiff was "completely independent and there [was] no need for any disability services[.]" We note that the IME was conducted nearly 14 months after the accident.

We take a brief segue at this point to discuss a related case that generated some of the documentary evidence used in this case. Before the instant lawsuit was filed, plaintiff was embroiled in a first-party no-fault action in which she sought personal protection insurance (PIP) benefits from Home-Owners Insurance Company in connection with the February 2018 motor-vehicle accident, which eventually reached this Court in *Humphrey v Home-Owners Ins Co*, unpublished per curiam opinion of the Court of Appeals, issued August 19, 2021 (Docket No. 354214); unpub at 1-2, wherein the panel stated:

> Relevant to the issues raised on appeal, in March 2020, Home-Owners moved for summary disposition under MCR 2.116(C)(10), asserting that Humphrey had made multiple false statements during her August 2019 deposition.[3] First, Humphrey testified that as a result of the February 27, 2018 motor vehicle crash, she suffered from depression, anxiety, headaches, and pain in her back, neck, left shoulder, and left wrist. She unequivocally denied that she had any of these issues before the accident. Her medical records, however, directly contradicted her denial. For example, Humphrey was treated for anxiety in 2011 and 2013. She also complained to her chiropractor of back pain in 2012 and 2015, and headaches and neck pain in 2015. Second, Humphrey testified at her deposition that she had been in a prior motor vehicle crash, but she denied filing an insurance claim in relation to that crash. Records from Allstate Property and Casualty Insurance Company, however, show that Allstate made payments to medical

---

[2] Dr. Orloski did explain that any injuries sustained to these areas were no more than mild soft-tissue or contusion-type injuries that would typically resolve themselves within one to three months.

[3] This deposition was presented as documentary evidence for purposes of summary disposition in this case, along with plaintiff's May 12, 2022 deposition that was taken directly in our litigation.

providers on Humphrey's behalf in 2007 for treatment of shoulder pain and a head injury arising out of a motor vehicle crash.[4] Finally, Humphrey testified that she could not drive for long periods of time due to anxiety and back pain, but records from Saganing Eagles Landing Casino indicate Humphrey went to the casino, which is a 50-minute drive from her home, 76 times in 2018, 110 times in 2019, and 31 times as of March 14, 2020.

Following oral argument, the trial court granted summary disposition after determining that there was no genuine question of material fact as to whether Humphrey's claim was barred by common-law fraud. Specifically, the court determined that Humphrey's statements during her deposition were material misrepresentations, that the statements were false, and that she made the statements knowingly or reckless[ly] and with the intent that Home-Owner's would rely upon them.

This Court reversed because although plaintiff had made numerous false statements during her deposition, the false statements did not warrant summary disposition of the claim for PIP benefits because the fraud occurred after legal proceedings were initiated; therefore, the validity of her allegations had to be tested by the trier of fact. *Id.* at 4.

Home-Owners had employed an investigative services company to conduct surveillance on plaintiff, and the reports and associated photographs produced as a result of that surveillance were submitted by defendant in this case. On February 11, 2019, an investigator observed plaintiff carrying a toddler "on her back into the residence through the garage entrance door," and the investigator noted that plaintiff "did not appear disabled in any way." On September 2, 2019, an investigator made the following observations:

At 3:43 p.m., the claimant [plaintiff Humphrey] and a female departed in the claimant's vehicle. At 3:56 p.m., she was pulled over by a state trooper, and we filmed her in the vehicle, turning her head and neck without difficulty. They stopped at a bank, where the other female used an ATM and the claimant put on her license plate tab, bending to do so without difficulty. They went to a store, where we filmed the claimant pushing a cart and shopping inside and loading a bag into the vehicle. They were then followed to a casino in Standish. We filmed them walking around, playing slot machines and eating at the casino. They departed at 9:59 p.m. . . . .

We now examine plaintiff's testimony in her two depositions. Eighteen months after the accident, in plaintiff's deposition taken on August 27, 2019, in the Home-Owner's lawsuit, she testified that she lived in a home with her four young children and no one else. Her youngest child was born about three weeks before the accident. Plaintiff asserted that when the accident occurred

---

[4] This is clearly the motor-vehicle accident referenced by plaintiff in her intake form for treatment at Preferred Chiropractic.

she immediately felt pain in her left wrist and shoulder, along with a little bit of head pain.[5]  Shortly after the accident, she started noticing back and neck pain when carrying and caring for her baby, which prompted her to seek follow-up medical care.  According to plaintiff, she participated in occupational and physical therapy for her left shoulder and wrist, but she never completed the therapy.  She complained of "constant pain and popping" in her left shoulder and "sharp pain and . . . numbness" in her left wrist.  Plaintiff also indicated that she had weakness and tingling in her left wrist.

Plaintiff claimed that she began experiencing anxiety and depression after the motor-vehicle accident, including some anxiety when driving or riding in a vehicle.  Plaintiff further testified that postaccident she began having vision issues for the first time in her life, which included occasionally and randomly seeing flashing white light and having blurriness in her right eye.  When she visited an ER because of the visual disturbances, a doctor informed her that her eyes were fine.  Plaintiff testified that before the accident in February 2018, she had never experienced anxiety, depression, headaches, or migraines, nor had she ever suffered from pain in her neck, shoulders, arms, wrists, back, legs, hips, or knees.  Many of these health issues were currently still plaguing her, including left shoulder, left wrist, back, and neck pain, as well as migraines, the visual disturbances, depression, and anxiety.  Plaintiff testified that her pain had generally not improved since the accident.  Her primary care physician prescribed pain medications and muscle relaxers for plaintiff.

Plaintiff was employed by Securitas Security Services as a security officer.  At the time of the accident, she was working eight-hour shifts on a full-time basis, and plaintiff would do "a lot of walking, a lot of standing" on the job, but she also sat for two hours checking in trucks at the beginning of her shifts.  Overall, "most of" the time she was on her feet at work.  Plaintiff testified that she went down to part-time at Securitas back in February 2019 due to physical pain and her depression and anxiety, which were causing her to often call in sick.  She went back, however to full-time employment at Securitas two months before the deposition because a position opened up and she had bills to pay.  Plaintiff noted that she would get "really sore" at the end of her work shift if she was especially busy on a given day, and she had trouble sitting at work for extended periods without having pain.

When plaintiff was asked whether there was anything else physically that she was having difficulty doing because of her injuries or pain, she responded, "cleaning" her home, and, closer in time to the accident, "picking her [infant daughter] up and . . . carrying her in her car seat[.]"  She qualified that answer by indicating that she was unable to do those types of things with her left hand and arm.  Plaintiff testified that she could not stand in one spot for long and hold her young one- and three-year-old children, but she could pick them up and transfer them "from one place to another."  Plaintiff claimed that her physician currently did not want her to lift "more than maybe ten pounds."  She asserted that she could not "drive for too long because of [her] back," although she could drive to her job, which was only ten minutes away from her home.

_____

[5] Plaintiff testified that her two oldest children and a niece were in the car when the accident took place and that she had just picked them up from school; they suffered minor injuries according to the traffic crash report.

-6-

In her May 2022 deposition, which was more than four years since the accident and about 33 months since her first deposition, plaintiff testified that she was no longer employed by anyone, having last worked for Securitas. She noted that she had been on maternity leave at the time the accident occurred in February 2018. Plaintiff added that while she did go down to part-time subsequent to returning to work with Securitas because of her physical pain and mental-health issues, another reason was that she was having difficulty finding someone to babysit her children. Plaintiff testified that she went down to part-time at Securitas once again after having returned to full-time work at the time of her last deposition, and eventually she was laid off by the company. She was not currently looking for employment because all of her time was being devoted to her children, the youngest of whom had autism. Plaintiff testified that she was involved in another motor-vehicle accident over 10 years earlier but was not injured. She indicated that she had applied for Social Security disability benefits about 15 years earlier "for mild scoliosis"; however, her claim was denied.

Plaintiff's testimony was substantially similar to her testimony given in the first deposition with respect to her physical pain, mental-health issues, migraines, and vision problems allegedly flowing from the car accident and which had either not improved, slightly improved, or, as with the migraines, worsened.[6] She asserted that her visits to Preferred Chiropractic years before the accident at issue were a result of a referral and tied to her scoliosis. Plaintiff recounted the pain that she suffered after the accident, which she described as being "bad" and drove her to see multiple healthcare providers in the period following the accident. She never had any surgeries related to the accident. In the deposition, a great amount of time was devoted to reviewing the healthcare providers that plaintiff visited after the accident, with defense counsel asking her if she recalled the provider's name, the reason for the visit, the diagnosis, and the prescribed treatment. While plaintiff could recall some of the information, she mostly answered that she no longer had any recollection or memory of the matters.

Plaintiff was asked how her injuries were affecting her in caring for her children, and she answered:

> My baby girl, with her being autistic, she likes for me to pick her up a lot. I can't pick her up a lot. I do have to have my two older children help me a little bit around the house with my two youngest if I need something, like if I'm in pain, I have to lay across the bed. They'll help me as far as, because she's still in diapers, I'll say bring me a diaper, you know, or something like that. They'll have to go do it for me, just trying to keep myself at a standstill around the house because I can't do too much moving around because it aggravates like the pain.

Plaintiff was then questioned regarding her children and whether they assisted plaintiff with household chores, and she replied:

> Yes, they definitely have to help. I mean I'll go behind them. I don't let them use chemicals and that type of thing and I know enough of that, but like I have hardwood floors, so mopping is very hard. Once I'm done with mopping, my back

---

[6] Plaintiff testified that she was suffering daily migraines that lasted about an hour.

is definitely in pain. I have to lay down flat for a little while. Even washing, like digging my hands in the washer to put the clothes in the dryer, that's strenuous even though it sounds so simple. Like I said, picking up my daughter, any type of lifting is not good for me right now.

Plaintiff contended that she liked to exercise, but that she could no longer do sit-ups and crunches because they brought on "back pain and neck pain." She also enjoyed walking, which she could still do after the accident, although she could not walk "too far." Plaintiff's repeated response was, "I don't remember," when asked whether any of the numerous doctors who saw and treated her placed her on any physical restrictions or limitations. She had no upcoming appointments or scheduled doctors' visits related to her injuries. Plaintiff testified that in December 2021, she was involved in another motor-vehicle accident; this time she "was rear-ended." She denied that she suffered any injuries in that accident, although her preexisting neck pain increased slightly.

Near the end of the deposition, which had been going on for about 90 minutes, plaintiff, upon questioning by her attorney, testified that she had developed lower back pain during the deposition, which she predicted would become more intense once she stood up. While she did not regularly attend church, when she did go to church, where services generally lasted a couple of hours, plaintiff experienced pain from sitting so long. Plaintiff concluded the deposition by claiming that before the accident she slept about five to six hours a night, which were "in pieces" given her young children, but that after the accident she "barely sleep[s]".

On February 23, 2021, plaintiff filed a complaint against defendant, alleging a single count of negligence and claiming that she suffered a serious impairment of body function. On August 9, 2022, defendant moved for summary disposition under MCR 2.116(C)(10). Defendant first argued that because plaintiff's "complaints were mere exaggerations of her symptoms and subjective . . . without objective findings," plaintiff could not establish an objectively manifested impairment. Next, defendant contended that the undisputed facts demonstrated that any purported impairment did not affect plaintiff's general ability to lead her normal life. Accordingly, because plaintiff could not establish a threshold injury as a matter of law, defendant was entitled to summary disposition under MCR 2.116(C)(10). In response, plaintiff maintained that there existed evidence sufficient to create a genuine issue of material fact regarding whether there were objectively manifested impairments and whether plaintiff's impairments affected her general ability to lead her normal life. To avoid redundancy, we shall discuss the details of the parties' arguments in the analysis section of this opinion, but only to the extent that an argument is repeated on appeal. On September 12, 2022, a hearing was held on defendant's summary disposition motion. The parties very briefly reiterated their positions expressed in their respective briefs. The trial court took the matter under advisement.

On November 15, 2022, the trial court issued a written opinion and order granting defendant's motion for summary disposition. The court first found that there was no genuine issue of material fact regarding the nature and extent of plaintiff's injuries. The trial court noted that both parties relied on Dr. Orloski's IME report, in which the doctor opined that plaintiff had sprained her left wrist, that she had contusions to that wrist, and that plaintiff had possible soft-tissue injuries to her neck, back, and left shoulder. The trial court also observed that Dr. Orloski had determined that the injuries would have taken, at most, four months to heal. The court asserted

that "neither party ha[d] offered a differing medical opinion or diagnosis concerning the nature and extent of these injuries."[7] The trial court explained that because there was no factual dispute regarding the nature and extent of the injuries, it was for the court to assess whether the injuries met the serious-impairment threshold.

With respect to the first question regarding whether plaintiff suffered an objectively manifested impairment, the trial court ruled that her left wrist and shoulder injuries constituted objectively manifested impairments, although the possible soft-tissue injuries to plaintiff's neck and back were not objectively manifested. In regard to whether there was an impairment of an important body function, the trial court found that because plaintiff was the single mother of four small children, the youngest of whom was an infant at the time of the accident, it was important for her "to have two fully functioning arms." Therefore, according to the court, an important body function was impaired.

Finally, with respect to whether the objectively manifested impairment affected plaintiff's general ability to lead her normal life, the court first discussed the associated legal principles or criteria enunciated in *McCormick v Carrier*, 487 Mich 180; 795 NW2d 517 (2010), and the application of those principles by our Supreme Court to the facts presented in *McCormick*. The trial court then concluded as follows:

> [A] comparison of Plaintiff's life before and after the accident shows no significant change attributable to her accident-related injuries. In the months immediately after the accident, Plaintiff received only minimal, noninvasive medical treatment. She used a splint and a sling for approximately three weeks, but her injuries did not require overnight hospitalization, and surgery was never discussed or recommended. Plaintiff did attend some recommended therapy but did not complete it. Further, Plaintiff continued to live independently with her four children after the accident and returned to work without any restrictions at the end of her maternity leave. Although Plaintiff subsequently went to part-time and was eventually laid off, there is no evidence that her accident-related impairments rendered her physically unable to perform her job functions. Instead, Plaintiff chose not to reenter the workforce because she was busy raising her children.
>
> Plaintiff also describes continuing pain symptoms that allegedly interfere with her ability to sleep, hold her youngest child, perform household chores, attend church, and exercise. However, Dr. Orloski concluded that Plaintiff's accident-related impairments were short-lived and did not result in residual disability or functional limitations. Further, the record lacks any contrary medical evidence linking Plaintiff's ongoing, subjective complaints and self-imposed lifestyle limitations to objectively manifested impairments caused by the accident. Therefore, even when the evidence is viewed in a light most favorable to Plaintiff, it does not establish that she sustained an objectively manifested impairment of

---

[7] The trial court found that there was an absence of medical evidence linking plaintiff's headaches, visual problems, and depression to the motor-vehicle accident.

important body function that was serious enough to affect her general ability to lead her normal life. Accordingly, the Court will grant Defendant's Motion.

Plaintiff subsequently moved for reconsideration. She argued that "[g]iven that the defendant did not argue that the duration of [p]laintiff's disability precluded it from impacting her normal life, [p]laintiff could not anticipate that this would be a basis for granting summary disposition." Plaintiff contended that caselaw established that a three- or four-month temporary disability was sufficient to find that an impairment affected a person's general ability to lead his or her normal life. The trial court denied the motion, concluding that plaintiff's argument did not show a palpable error by which the court or the parties were misled but instead presented the same issues previously considered and ruled on by the court, "either expressly or by implication."

## II. ANALYSIS

## A. APPELLATE ARGUMENTS

On appeal, plaintiff argues that the trial court erred by granting summary disposition in favor of defendant given that the evidence, when viewed in a light most favorable to plaintiff, created a genuine issue of material fact regarding whether she suffered a temporary serious impairment of body function. Plaintiff relies on the principle set forth in *McCormick*, 487 Mich at 203, that MCL 500.3135(5) "does not create an express temporal requirement as to how long an impairment must last in order to have an effect on the person's general ability to live his or her normal life." She cites several unpublished opinions from this Court applying this principle in favor of plaintiffs where the impairments affected the general ability of the plaintiffs to live their normal lives even though the effect was of short duration. In her statement of facts, plaintiff posits that "[t]he evidence, at a minimum, showed that [p]laintiff had an objectively manifested wrist sprain that impaired her ability to do housework and care for her children for three to four months."

In the argument section of her brief on appeal, plaintiff recites the standard of review, the rules associated with deciding a motion for summary disposition under MCR 2.116(C)(10), the principles applicable to evaluating whether a serious impairment of body function was demonstrated, including the no-temporal-requirement principle enunciated in *McCormick*, and the unpublished opinions. Plaintiff then concludes her brief by arguing as follows:

> In our case, [p]laintiff was the mother of three children including a newborn.[8] Her sprained wrist impaired her ability to comfort and care for her children and do housework. Even if the sprain should have resolved in four months, that should not be a bar to recovery. A four-month impairment that affects some of the person's ability to live in his or her normal manner of living is a serious impairment under *McCormick* and the cases cited above.

This is effectively the full extent of plaintiff's argument on appeal.

---

[8] Plaintiff has four children.

Defendant argues that the trial court properly granted summary disposition in favor of defendant because reasonable minds would not differ regarding the fact that plaintiff did not suffer a serious impairment of body function. Defendant initially maintains that plaintiff failed to produce any evidence of an impairment that was objectively manifested. He contends that plaintiff's subjective complaints of pain were insufficient to establish an objective injury.

Defendant next asserts that as a matter of law the evidence did not support a finding that plaintiff's general ability to lead her normal life was affected. Defendant argues that contrary to plaintiff's claim, the trial court did not base its decision solely on the duration of plaintiff's injuries or impairments. Defendant contends that the trial court correctly found that plaintiff did not establish that she sustained any impairment that was serious enough to affect her general ability to lead her normal life, properly weighing multiple aspects of plaintiff's life before and after the motor-vehicle accident.

## B.  STANDARD OF REVIEW AND PRINCIPLES GOVERNING SUMMARY DISPOSITION

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011).

In *Anderson v Transdev Servs, Inc*, 341 Mich App 501, 506-507; 991 NW2d 230 (2022), this Court set forth the guiding principles in analyzing a motion brought pursuant to MCR 2.116(C)(10):

> MCR 2.116(C)(10) provides that summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." A motion brought pursuant to MCR 2.116(C)(10) tests the factual support for a party's action. "Affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted in the motion are required . . . when judgment is sought based on subrule (C)(10)," MCR 2.116(G)(3)(b), and such evidence, along with the pleadings, must be considered by the court when ruling on the (C)(10) motion, MCR 2.116(G)(5). "When a motion under subrule (C)(10) is made and supported . . ., an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." MCR 2.116(G)(4).
>
> A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. [Quotation marks, citations, and brackets omitted.]

## C.  MCL 500.3135 AND SERIOUS IMPAIRMENT OF BODY FUNCTION

Aside from certain enumerated exceptions, the no-fault act, MCL 500.3101 *et seq.*, abolished tort liability for injuries caused by the ownership, maintenance, or use of a motor vehicle. *Gray v Chrostowski*, 298 Mich App 769, 775; 828 NW2d 435 (2012). MCL 500.3135(1) provides

threshold exceptions to tort immunity with respect to the recovery of noneconomic damages. *Id.* MCL 500.3135(1) states that "[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement."[9] At the time of the accident, MCL 500.3135(5) defined a "serious impairment of body function" as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." 2012 PA 158.[10]

Under the first prong of the prior version of MCL 500.3135(5), it had to be proven that the injured party suffered an objectively manifested impairment of a body function. See *McCormick*,

---

[9] MCL 500.3135(2)(a) provides:

> The issues of whether the injured person has suffered serious impairment of body function or permanent serious disfigurement are questions of law for the court if the court finds either of the following:
>
> (*i*) There is no factual dispute concerning the nature and extent of the person's injuries.
>
> (*ii*) There is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination whether the person has suffered a serious impairment of body function or permanent serious disfigurement. . . . .

[10] Pursuant to an amendment of MCL 500.3135, enacted under 2019 PA 21 and 22, and made effective June 11, 2019, subsection (5) of the statute now provides:

> As used in this section, "serious impairment of body function" means an impairment that satisfies all of the following requirements:
>
> (a) It is objectively manifested, meaning it is observable or perceivable from actual symptoms or conditions by someone other than the injured person.
>
> (b) It is an impairment of an important body function, which is a body function of great value, significance, or consequence to the injured person.
>
> (c) It affects the injured person's general ability to lead his or her normal life, meaning it has had an influence on some of the person's capacity to live in his or her normal manner of living. Although temporal considerations may be relevant, there is no temporal requirement for how long an impairment must last. This examination is inherently fact and circumstance specific to each injured person, must be conducted on a case-by-case basis, and requires comparison of the injured person's life before and after the incident.

487 Mich at 195.[11]  With respect to that issue, we note that the focus is on whether the alleged *impairment* was objectively manifested, not whether the *injury* was objectively manifested.  *Id.* at 197; *Patrick v Turkelson*, 322 Mich App 595, 606; 913 NW2d 369 (2018).

"[T]he common meaning of 'objectively manifested' in MCL 500.3135[] is an impairment that is evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function."  *Id.* at 196.  The "objectively manifested" requirement signifies that a plaintiff must submit evidence establishing that there is a physical basis for a subjective complaint of pain and suffering and that demonstrating an impairment generally but not always requires medical testimony.  *Id.* at 198.

With respect to the question regarding a person's general ability to lead his or her normal life, an "impairment to an important body function affects a person's general ability to lead a normal life if it has 'an influence on some of the person's capacity to live in his or her normal manner of living.' "  *Patrick*, 322 Mich App at 607, quoting *McCormick*, 487 Mich at 202.

## D.  DISCUSSION AND RESOLUTION

Although there is documentary evidence, including plaintiff's deposition testimony, alluding to purported wrist, arm, elbow, shoulder, back, neck, and sacroiliac pain, headaches and migraines, anxiety and depression, and visual disturbances, plaintiff ultimately relies solely on her complaint of a sprained and painful left wrist in pursuing her appeal.  Therefore, our focus will be on the alleged left wrist injury.  Similarly, while there is documentary evidence of various alleged impacts on plaintiff's life resulting from the accident, she only argues that the wrist injury impaired her ability to do housework and care for her children.  Accordingly, with respect to impairments, we shall examine and consider plaintiff's ability to do housework and care for her children in light of the injury to plaintiff's left wrist.

We limit our analysis to the arguments actually presented by plaintiff because as our Supreme Court explained in *Mudge v Macomb Co*, 458 Mich 87, 105; 580 NW2d 845 (1998):

> It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow. [Quotation marks and citation omitted.]

Moreover, to the extent that plaintiff's arguments do not address or reach some of the grounds relied on by the trial court to grant summary disposition, e.g., the alleged impairments based on soft-tissue injuries were not objectively manifested or were actually "self-imposed life-style limitations," appellate relief is entirely unwarranted.  See *Denhof v Challa*, 311 Mich App

---

[11] We note that the *McCormick* Court referred to subsection (7) of MCL 500.3135, which, at that time, contained the "objectively manifested impairment" language.  See 2002 PA 697.

499, 521; 876 NW2d 266 (2015) ("When an appellant fails to dispute the basis of a lower court's ruling, we need not even consider granting the relief being sought by the appellant.").

We initially reject defendant's contention that there was inadequate evidence to show any impairment that was objectively manifested. Defendant analyzes all of the injuries and areas of pain that plaintiff alleged below, but, for the reasons noted above, we shall only address plaintiff's claims regarding her left wrist. As explained in *McCormick*, 487 Mich at 197, the alleged impairment and not the injury must be objectively manifested; therefore, in the context of the instant case, the issue is whether plaintiff's limited or painful use of her left wrist was objectively manifested. We conclude that there was evidence of a physical basis for plaintiff's subjective complaints of pain and curtailed range of motion with respect to her left wrist. The ER report noted swelling of and an abrasion to plaintiff's left hand, and a physiological connection between the injuries to plaintiff's left hand and her left wrist seems likely, especially where the ER physician's diagnosis was "[s]prain of left wrist." Regardless, the orthopedist who saw plaintiff in April 2018 noted a contusion, i.e., a bruise, directly on plaintiff's left wrist. And most compelling was Dr. Orloski's determination that an MRI of plaintiff's left wrist suggested a sprain and contusion. We hold that there was evidence sufficient to create a genuine issue of material fact regarding whether plaintiff sustained an objectively manifested impairment in relation to the use of her left wrist.

Nevertheless, we uphold the trial court's ruling that there existed no genuine issue of material fact that plaintiff's general ability to lead her normal life was not affected by any impairment. We note the documentary evidence did not show that her sprained left wrist, *in and of itself and without consideration of any elbow, shoulder, neck, or back problems*, caused an inability to care for her children or perform household chores. In regard to her children, plaintiff's allegations concerned difficulty or the inception of pain in holding them when standing and carrying them, especially in connection with her baby. But nothing in the evidence demonstrated that her braced and sprained left wrist alone precluded these activities or produced this condition. And the same is true with respect to household chores. Indeed, the evidence indicated or suggested that it was plaintiff's alleged back pain that caused her issues in holding and carrying her children and in doing housework. Therefore, on a causation level plaintiff's action necessarily fails.

Assuming for the sake of argument that the sprained left wrist *alone* could potentially support her suit, plaintiff claimed in her first deposition that her injuries or the pain associated with her injuries affected her ability to clean her home and her ability to pick up her infant daughter and carry her in her car seat. But then plaintiff clarified and testified:

> I mean I can pick her[12] up on my right side, yes. I can pick 'em both up, it's just kind of like I can't really like hold 'em. If I was helping 'em get out the car or something like that like I can do that but I can't just like hold 'em.

\* \* \*

---

[12] This was a reference to plaintiff's three-year-old daughter, who was the second youngest of her children.

-14-

Like if I'm just for example maybe standing in front of the TV just holding her like on my hip or something. I can't just like hold 'em. I can pick up and transfer 'em from one place to another.

We note plaintiff did not testify that she could not hold her children while seated. In her second deposition, plaintiff testified that she could not pick up her infant daughter "a lot." On this record, we cannot conclude that the wrist-related impairment affected plaintiff's general ability to lead her normal life relative to the care of her children—any effect was *de minimis*.

With respect to household chores, in the first deposition, plaintiff vaguely asserted that she had difficulty with "cleaning." In her second deposition, plaintiff testified that her children had to help her with household chores. She mentioned mopping her hardwood floors, but then indicated that she did the mopping and had back pain afterward. Plaintiff also testified of having difficulty pulling clothes out of the washing machine and putting them into the dryer. Again, plaintiff testified to performing the act herself, not any one of her children. Plaintiff was able to perform these household tasks, albeit with some alleged pain. As before, on this record, we simply cannot conclude that the wrist-related impairment affected plaintiff's general ability to lead her normal life relative to household chores—any effect was *de minimis*. Even contemplating household chores in conjunction with holding and carrying her children, it simply does not add up to a general inability of plaintiff to lead her normal life.

With respect to the trial court's ruling, plaintiff is mistaken in her assertion that the court failed to recognize that there is no durational or temporal requirement in establishing a serious impairment of body function. The trial court observed that "while temporal considerations are relevant, an impairment need not be permanent to affect the person's general ability to lead their normal life." The trial court noted that Dr. Orloski opined that any impairments were "short-lived," but to the extent that the court embraced and adopted Dr. Orloski's view, the court additionally ruled that there was no significant change in plaintiff's life attributable to the accident when comparing her life before and after the crash. Limited to consideration of the left wrist injury, we agree with the court for the reasons discussed earlier.

We hold that the trial court did not err in granting defendant's motion for summary disposition.

Affirmed. Having fully prevailed on appeal, defendant may tax costs under MCR 7.219.

/s/ Noah P. Hood
/s/ James Robert Redford
/s/ Allie Greenleaf Maldonado

-15-