*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* ESTATE OF ELZE D. HARRIS.

---

CHRISTINE CASWELL, Personal Representative of the ESTATE OF ELZE D. HARRIS,

UNPUBLISHED
September 28, 2023

Appellee,

v

No. 362364
Eaton Probate Court
LC No. 2020-055947-DE

DENISE RODGERS,

Appellant.

---

Before: HOOD, P.J., and REDFORD and MALDONADO, JJ.

PER CURIAM.

Appellant, Denise Rodgers, appeals by right an order of the probate court removing Rodgers as the personal representative of the Estate of Elze D. Harris and replacing her with appellee, Christine Caswell. Harris, the decedent, was Rodgers' father, and Caswell is an attorney unrelated to the Harris family. As part of the probate court's ruling, Rodgers was ordered to pay back rent to the estate to cover a period of time that Rodgers and her grandson lived in her father's home following his death, plus future rent for any time that they remained in the home. Pursuant to the probate court's order, Rodgers and her grandson vacated the residence when she was unable to make the rental payment, and Caswell, as successor personal representative, subsequently placed the house for sale. On appeal, Rodgers does not challenge her removal as personal representative, but she does argue that the probate court erred by dispossessing her of the home and by ordering her to pay rent. We affirm.

## I. BACKGROUND

As reflected in his death certificate, Harris died on February 25, 2020, from chronic obstructive pulmonary disease and dementia. He was 86 years old, a widower, and a former truck driver. The death certificate further indicated that he passed away at his home located on Harvest Lane in Eaton County. Probate court documents established that Harris had three living children

-1-

at the time of his death, Rodgers, Christopher Harris, and Willie Harris. We shall use the first names of Harris's two sons for the remainder of this opinion to avoid any confusion.[1]

On April 10, 2020, in the probate court, Christopher filed an application for informal probate and appointment of personal representative. Christopher sought to be appointed personal representative of the estate. He additionally filed a notice of intent to request informal appointment of personal representative, a testimony-to-identify-heirs document, and three waiver/consent forms, only one of which was signed—the one for Christopher himself. Christopher also filed with the court his father's last will and testament, which had been executed in June 1985. Harris devised his entire estate, real, personal, or mixed, to his wife, but because she predeceased him in December 2017, the entire estate went to the three children in equal shares under the terms of the will. Pursuant to language in the will, Harris's wife was nominated and appointed as personal representative, and Rodgers, not Christopher, was designated as the alternative personal representative. The will provided that the personal representative was granted full power, without the necessity of a court order, "to sell, exchange, mortgage or otherwise dispose of or encumber any part of [the] estate, real, personal or mixed[.]"

On April 22, 2020, Rodgers filed an objection to Christopher's application for informal probate and appointment of personal representative. In the objection, Rodgers asserted that she had been her father's "personal caregiver for the last two years of his life, initially on a rotating basis with other family members until she moved into his home . . . in September 2019." Rodgers further alleged that Harris wanted her to be the personal representative of his estate, that Christopher had no standing to serve as the personal representative, and that before he died, Harris had expressed to Rodgers that he did not trust Christopher or Christopher's wife and did not want them "to make any decisions or have any authority over his estate." Rodgers requested that the probate court deny Christopher's application and instead appoint her as the personal representative of her father's estate. On April 29, 2020, Rodgers filed her own application for informal probate and appointment of personal representative.

On May 1, 2020, Christopher filed a response and consent to the objection. Christopher contended that he filed his application in the probate court because Rodgers had "repeatedly refused to proceed with filing paperwork" in the court as necessary to establish their father's estate. Christopher asserted that Rodgers had refused to provide him with an accounting of Harris's bank account to which Rodgers had added her name in January 2018 for the purported sole purpose of taking care of Harris and paying his bills. Christopher further maintained that he learned in March 2020 that Rodgers had earlier obtained a durable power of attorney from their father and that on March 8, 2019, she had utilized the power of attorney to convey Harris's house to herself by quitclaim deed for no consideration, contrary to the wishes of their father. Christopher claimed that Harris "had suffered from dementia and related physical and mental incapacities and infirmities for at least five years prior to his death and [that] since before January 2018, his mental health and capacities continued to significantly worsen . . . until his death in February 2020." Christopher also alleged that Rodgers had personal knowledge that their father intended for the house "to pass to his three children in equal values upon his death in accordance with his

---

[1] We note that the probate court filings indicated that Willie is legally disabled due to a stroke.

Will . . . , having repeatedly refused to sell the home to [Rodgers] since as early as 2017." Nevertheless, Christopher consented to her application for informal probate and appointment of personal representative, asking the probate court to set up the estate and appoint Rodgers as the personal representative, thereby making her subject to further fiduciary duties and the scrutiny of the court.

On May 11, 2020, a register's statement signed by the deputy probate register appointed Rodgers as the personal representative of the estate. On that same date, Rodgers executed an acceptance of appointment, and letters of authority were issued by the probate court. On July 30, 2020, Rodgers filed an inventory of her father's estate. The inventory indicated that the estate held Harris's home on Harvest Lane that had a gross value of $136,000, a 1995 Cadillac Deville worth $1,000, and various household goods and furnishings with a gross value of $500.

On June 9, 2021, the probate court entered an order to show cause why Rodgers should not be held in civil contempt for failing to file a notice of continued administration of the estate. A hearing was set on the matter for July 1, 2021, but on June 16, 2021, Rodgers filed a notice of continued administration. Nearly nine months later, on March 7, 2022, Christopher filed a petition to remove Rodgers as personal representative. Christopher alleged that Rodgers had committed various breaches of her fiduciary duties under MCL 700.3611.[2]

Christopher first asserted a breach of duty based on the fact that Rodgers had been living in their father's home since his death without paying rent to the estate. Given the $136,000 value of the house as listed in the inventory, Christopher argued that Rodgers should have been and should be paying $1,360 in monthly rent, owing the estate $32,640 for two years of living in the

---

[2] MCL 700.3611(2) provides:

> The court may remove a personal representative under any of the following circumstances:
>
> (a) Removal is in the best interests of the estate.
>
> (b) It is shown that the personal representative or the person who sought the personal representative's appointment intentionally misrepresented material facts in a proceeding leading to the appointment.
>
> (c) The personal representative did any of the following:
>
> (*i*) Disregarded a court order.
>
> (*ii*) Became incapable of discharging the duties of office.
>
> (*iii*) Mismanaged the estate.
>
> (*iv*) Failed to perform a duty pertaining to the office.

home. The next breach of duty alleged by Christopher was that Rodgers had refused to allow access to Harris's tangible personal property for distribution to the beneficiaries. The last breach of duty claimed by Christopher was that Rodgers had refused to allow Harris's "handicapped son[3] to receive [Harris's] very new lift chair from the estate, claiming that she used her own funds to purchase it—yet at the same time providing opposing counsel documentation to prove that she in fact used [Harris's] funds to purchase it for him."

In the petition, Christopher additionally maintained that there was a pending civil case in the circuit court in which he had sued Rodgers and that the circuit court case was interfering with Rodgers' actions to settle the estate and creating a conflict of interest. Christopher contended that it would be in the best interest of the estate to remove Rodgers as the personal representative. Christopher indicated that his attorney had contacted a third-party professional fiduciary, appellee Caswell of Caswell Law, PLC, who was willing to accept the position of successor personal representative. Christopher asked the probate court to surcharge Rodgers under MCL 700.3712 for all past rent due to the estate, which amounted to $32,640.[4]

A probate court order dated March 24, 2022, stated that a hearing was held on that date relative to Christopher's petition to remove Rodgers as the personal representative. The record presented to this Court does not contain a transcript of that hearing. The order provided that Rodgers was removed as personal representative, that Caswell was appointed as successor personal representative of the estate, and that Rodgers had to pay the estate "the amount of $1,360.00 per month beginning [on] February 26, 2020 through the date that the estate is closed or the date that she vacates the premises." The order further provided that "[a]ll amounts due from February 26, 2020 through March 31, 2022 shall be paid within 10 days of entry of this Order." In a separate order, Rodgers was directed to file a final account no later than April 30, 2022, and to surrender any estate property under her control to Caswell.

On April 4, 2022, Rodgers moved to set aside the order that had removed her as personal representative of the estate. Rodgers argued that despite Christopher's claims that Rodgers was served with his petition to remove her as personal representative and the related notice of hearing, she was never actually served with the petition or notice of hearing and thus never appeared at the hearing on March 24, 2022. We note that there is a proof of service in the record indicating that Christopher had served Rodgers' attorney by first-class mail with his petition to remove Rodgers as personal representative and the notice of hearing. In the motion to set aside the removal order, Rodgers argued that there was "no evidence that there were any breaches of fiduciary duties." She further alleged that she "moved into [t]he home when her parents died because there [was] a minor child[5] living in the home and attending the public schools in that jurisdiction who needed supervision." According to Rodgers, the child still lived in the home, had grown close to Harris and his wife, had been upset when Harris died, and had never lived in any other home. Rodgers

---

[3] We assume that this was a reference to Willie.

[4] MCL 700.3712 provides that "[i]f the exercise or failure to exercise a power concerning the estate is improper, the personal representative is liable to interested persons for damage or loss resulting from breach of fiduciary duty to the same extent as a trustee of an express trust."

[5] Later filings revealed that this was a reference to Rodgers' grandson and Harris's great-grandson.

-4-

denied that she had ever refused to allow the beneficiaries access to tangible personal property in the home or that she had denied the beneficiaries access to the house. Rodgers also contended that Christopher made several false accusations against her in the circuit court lawsuit filed by Christopher that was pending trial and that the probate court should await resolution of that case before distributing the estate.

In her motion to set aside the removal order, Rodgers additionally posited that there was no evidence that the lift chair had been purchased using Harris's funds. Rodgers asserted that she provided receipts demonstrating that she had spent a substantial amount of her own monies for her father's "benefit before he died and while she was caring for him full-time in the home." Rodgers argued that the third-party fiduciary, Caswell, was unnecessary and would be costly to the estate. Rodgers further maintained that her siblings had been given access to have the house and personal property therein appraised, but that they never did so, indicating that they would accept the amounts set forth in the inventory, which was never the subject of an objection. Finally, Rodgers contended that she had been paying the property taxes and insurance on the home, along with covering the costs to maintain the house.

On April 18, 2022, Christopher filed a response to Rodgers' motion to set aside the removal order. Christopher claimed that Rodgers' counsel had been served by first-class mail with his removal petition and the associated notice of hearing. Christopher noted that at the hearing on March 24, 2022, the court not only granted Christopher's petition by default, the court also found that there existed clear and convincing evidence that Rodgers should be removed as personal representative. Christopher further argued that "regardless of the reason for a minor child living in the house owned by the estate, rent is required." Christopher asserted that Rodgers failed to provide a relevant reason or legal basis to set aside the probate court's previous order.

The record reflects that a hearing was held on May 25, 2022, on Rodgers' motion to set aside the removal order. We have no transcript of the hearing, and the probate court issued an order on May 26, 2022, granting Rodgers' motion and setting aside the removal order. The probate court set a hearing date for July 7, 2022, on Christopher's petition to remove Rodgers as personal representative. On June 7, 2022, Rodgers filed a response to Christopher's petition to remove her as personal representative. The response essentially mimicked the points made by Rodgers in her motion to set aside the removal order.

On July 7, 2022, an evidentiary hearing was held on Christopher's petition to remove Rodgers as personal representative and replace her with Caswell. At the beginning of the hearing, Christopher's counsel noted that the circuit court civil action against Rodgers concerned alleged breaches of Rodgers' fiduciary duties when acting as Harris's durable power of attorney, as well as allegations of conversion. Rodgers' attorney observed that in relation to the circuit court action, the circuit court had ordered that funds in a bank account held by Harris/Rodgers be moved to a trust account, leaving only the house and a car as the assets contained in the estate. The probate court stated that it had been 27 months since the estate was opened and that no valid accounting had ever been filed by Rodgers; the two that were submitted had been rejected according to the court.

Rodgers was the only person to testify at the hearing, and she was called as a witness by Christopher's attorney. Her understanding of her father's will was that after he died, "everything

-5-

was to be going to [her]," and then she "could sell it" or "do anything [she] wanted with it," but "then split it . . . three ways between the three of us." Rodgers testified that she was unaware that she had to do annual accountings of the estate's assets. Rodgers agreed that her duty as personal representative was owed to the estate and not to any particular beneficiary. When asked why she had not placed the house for sale during the past two years in the hot real estate market, Rodgers replied, "My father did not want the house sold. My father told me in his own voice that he did not want the home sold." She insisted that Harris's will did not state that she had to sell the house upon his death. On query whether she understood that the three siblings each had an interest in the estate's assets, Rodgers responded, "If you say so."

Rodgers acknowledged that she had lived in her father's home with her grandson, who had just graduated high school, for several years, including since the time Harris died in February 2020. Rodgers conceded that she had not paid any rent while residing in the home, although she had paid all of the expenses associated with the house. Rodgers was asked whether she owned the house, and she replied, "It's in my name." Rodgers explained that her father wanted the home put in her name, so using the durable power of attorney executed by Harris, she conveyed the house from Harris to herself by quitclaim deed. But she had also listed the home as part of the estate's inventory because she was "never . . . trying to screw anybody out of anything." Rodgers explained that she did plan to buy her brothers out of their interests in the house. The subject of the circuit court suit arose, and Rodgers indicated that Christopher was suing her for allegedly stealing money from their father's bank account, although she adamantly denied that she had done so.[6]

On cross-examination by her own attorney, Rodgers claimed that her father's will allowed her to do anything that she wanted to do with the estate's assets, including selling them "at any price that [she] wanted[.]" Rodgers did assert that she had not stolen anything from the estate. She also testified that Christopher's civil lawsuit against her had been filed about one month after the death of their father and that she was not permitted to make any asset distributions while the case was pending.

This concluded the testimony, and the probate court proceeded to rule from the bench on Christopher's petition to remove Rodgers as personal representative. The probate court first reviewed the language in Harris's will. The court noted that Rodgers was only entitled to an equal share of the estate under the terms of the will. The probate court then stated that no valid accounting had been filed in the 27 months that the estate had been open. The court further concluded that Rodgers' grandson had been living in the home rent free and that home expenses had been paid by the estate. The probate court additionally ruled:

> [T]here's certainly an abundance of evidence to show this court that . . . personal representative [Rodgers] is not performing the duties that she has a statutory obligation to perform in this case. And given the fact that the family is

---

[6] In Rodgers' brief on appeal, she states that Christopher alleged claims of undue influence, breach of fiduciary duties, criminal fraud, and misrepresentation against Rodgers in the circuit court case. According to Rodgers, Christopher asserted that she took advantage of their ailing father and stole $157,510 from him or the estate.

also in litigation on this[, it] does not make sense to appoint a family member to serve as personal representative, and I do find that a neutral is necessary.

So, . . . I will grant your motion and appoint Ms. Caswell, who I know to be an independent person, who can serve in that capacity. I will immediately remove [Rodgers] . . . as personal representative and . . . appoint Ms. Caswell to administer the estate.

The probate court was ready to conclude the hearing when Christopher's counsel asked about the request that Rodgers pay rent for the time that she and her grandson had lived in the home following Harris's death. The court first indicated that it would not order the payment of rent because that was an issue in the circuit court case. But on further prompting by counsel that the rent demand had indeed been part of Christopher's removal petition, the probate court concluded:

Okay. Let me just look at that real quickly. You are correct, and I will then include that as part of the order. I do find that it's reasonable that rent be paid. The estate should not have to bear that burden. So, I'll sign the orders at this time.

The probate court immediately entered two orders memorializing its ruling. In one order, the probate court ruled that one or more of the circumstances for removal set forth in MCL 700.3611 was or were proven, that Rodgers was removed as personal representative, and that Caswell was appointed as successor personal representative. In the second order, the probate court ruled that Rodgers had to pay the estate "the amount of $1,360.00 per month beginning [on] February 26, 2020 through the date that the estate is closed or the date that she and her grandson have both vacated the premises." The order further provided that "[a]ll amounts due from February 26, 2020 through June 30, 2022 shall be paid within 10 days of entry of this Order."

On July 22, 2022, Christopher moved to enforce the probate court's orders, arguing that the amount due in rent was $38,080, that Rodgers had failed to pay any money to the estate, and that Rodgers had failed to vacate the premises. Christopher sought an order holding Rodgers in contempt of court, allowing Caswell to change the locks to the house, and requiring all occupants of the home to vacate the premises within seven days. On July 28, 2022, Rodgers filed her claim of appeal in this Court. No stay was entered or ordered. By order dated August 10, 2022, the probate court found that Rodgers was in contempt of court, and it ruled that Rodgers and any other occupants of the house had to vacate the premises by August 24, 2022. The probate court also declared that Caswell was authorized to change the locks to the home any time after August 24, 2022, and take full possession. Finally, the court ordered Rodgers to pay Caswell $39,440 in back rent.

In a petition filed by Caswell on October 7, 2022, she alleged that back on August 25, 2022, she took possession of the home and contacted a liquidator, an auctioneer, and a realtor in the process of administering the estate. Caswell asked the probate court to approve a sale of the home for $156,900. She supplied the court with a supporting purchase agreement. Caswell also requested approval of invoices totaling $4,707.50. In two orders dated October 26, 2022, the probate court approved both of Caswell's requests. On December 15, 2022, long past due, Rodgers filed a first and a final account of fiduciary, covering the period of May 11, 2020, to May 10, 2022,

-7-

and she filed a petition to allow the accounts. On December 21, 2022, the probate court entered an order allowing the accounts. The lower court record ends at this point, and we are not privy to further developments and Caswell's efforts to close on the sale of the house and distribute and finalize the estate.[7]

## II. ANALYSIS

### A. STANDARDS OF REVIEW

We review for an abuse of discretion a probate court's dispositional ruling following an evidentiary hearing or trial. *In re Portus*, 325 Mich App 374, 381; 926 NW2d 33 (2018). A probate court abuses its discretion when it makes a decision that falls outside the range of reasonable and principled outcomes. *Id.* An abuse of discretion necessarily occurs when the probate court makes an error of law. *Id.* This Court reviews for clear error the factual findings underlying a probate court's ruling. *Id.* A factual finding is clearly erroneous when this Court is left with a definite and firm conviction that a mistake was made, even when there is evidence to support the probate court's finding. *Id.* " 'The reviewing court will defer to the probate court on matters of credibility, and will give broad deference to findings made by the probate court because of its unique vantage point regarding witnesses, their testimony, and other influencing factors not readily available to the reviewing court.' " *In re Conservatorship of Brody*, 321 Mich App 332, 336; 909 NW2d 849 (2017), quoting *In re Erickson Estate*, 202 Mich App 329, 331; 508 NW2d 181 (1993). "We review de novo a probate court's construction and interpretation of the language used in a will or a trust." *In re Stillwell Trust*, 299 Mich App 289, 294; 829 NW2d 353 (2012).[8]

### B. APPELLATE ARGUMENTS[9] – DISCUSSION AND RESOLUTION

#### 1. RIGHT TO POSSESSION

On appeal, Rodgers first argues that as an occupying cotenant of the house under a joint tenancy, she was denied her right to possession of the home when she was ordered to move out of the house, the locks were changed, and Caswell barred access. Stated otherwise, disseisin

---

[7] Given that the house was to be sold by the estate through personal representative Caswell, we assume that the earlier quitclaim deed conveying the house to Rodgers was either voided or rescinded or that Rodgers quitclaimed the house back to the estate.

[8] "An appeal from the probate court is on the papers filed and a written transcript of the proceedings in the probate court or on a record settled and agreed to by the parties and approved by the court." MCR 5.802(B)(1); see also MCL 600.866(1). An appeal from the probate court "shall not be tried de novo." MCL 600.866(1). In estate proceedings, "[a]ppellate review, including the right to appellate review or interlocutory appeal and provisions as to time, manner, notice, appeal bond, stays, scope of review, record on appeal, briefs, arguments, and the power of the appellate court, is governed by the revised judicature act of 1961 and by supreme court rule." MCL 700.1305.

[9] Appellee Caswell has not filed a brief on appeal.

occurred. Rodgers describes the three siblings as cotenants, claiming that they all had keys to the home since before their father died and that the locks had not been changed by Rodgers.[10] Rodgers argues that the will created a joint tenancy, with her, Willie, and Christopher being cotenants. Rodgers maintains that she never ousted her brothers from the house, that they never went to the home after she moved in, that they never requested entry into the house, that had they come to the property, she could not have refused entry, and that she told them that they could come to the home whenever they pleased.[11] Interestingly, Rodgers then asserts that her cotenants—her brothers—did in fact come to the home in March 2021 after asking the court to allow them to have the real and personal property appraised. But, according to Rodgers, they started an argument when they arrived and no appraisals were done because her brothers did not even bring any appraisers with them. Yet again, none of these factual allegations are supported by the record and, as with all the other unsupported factual claims, there is no citation to the record as required by MCR 7.212(C)(7) (facts stated in the argument section of a brief "must be supported by specific page references to the transcript, the pleadings, or other document or paper filed with the trial court").

Rodgers insists that "there were never any overt acts of any kind[] to prevent the cotenants from sharing occupancy of the home[,]" but that she was then wrongfully deprived of access to the house after Caswell became the personal representative and took steps to sell the house. Rodgers reiterates that she was wrongfully deprived of her "cotenant" right to possess the property, that she had the same right to possess the property as her brothers, and that she had been the occupying tenant.

We conclude that Rodgers' reliance solely on the law regarding joint tenancies, the rights of cotenants, and ouster is misplaced. See, generally, *Wengel v Wengel*, 270 Mich App 86; 714 NW2d 371 (2006) (thoroughly discussing joint tenancies and cotenant rights); 1 Cameron, *Michigan Real Property Law* (3d ed), Concurrent Ownership, § 9.1 *et seq*. Instead, the law concerning the administration and distribution of estates primarily governs our analysis. Thus, this case implicates the Estates and Protected Individuals Code, MCL 700.1101 *et seq*.

Although we will substantively address Rodgers' arguments, it appears to us that this issue has become moot. Rodgers' position is that she was wrongfully denied possession of the real property; however, unless the sale fell through, the house has been sold. In *Adams v Parole Bd*, 340 Mich App 251, 259; 985 NW2d 881 (2022), this Court explained the doctrine of mootness:

> Issues involving mootness are questions of law that are reviewed de novo. This Court's duty is to consider and decide actual cases and controversies. Generally, this Court does not address moot questions or declare legal principles that have no practical effect in a case. Mootness occurs when an event has occurred that renders it impossible for the court to grant relief. An issue is also moot when a

---

[10] We note that there is no evidence in the record supporting these factual claims about the keys and the locks.

[11] Again, there is no record evidence supporting these factual claims. They were certainly not elicited from Rodgers during her testimony at the evidentiary hearing.

judgment, if entered, cannot for any reason have a practical legal effect on the existing controversy. [Quotation marks and citations omitted.]

With the sale of the house, it is impossible to grant any relief in the form of putting Rodgers back into possession of the home. And there would be no damage remedy compensating her for disseisin because it was a ruling by the probate court and not independent or unilateral acts by Caswell or the interested persons that effectuated her removal from the home. Nevertheless, we will continue with our examination of her arguments.

The underlying premise of Rodgers' stance is that upon Harris's death, a joint tenancy with respect to ownership of the house was created, with each of the siblings becoming cotenants and holding all the rights associated with that status. We initially note that this premise is not consistent with the plain language of the will, which provided, in pertinent part, that Harris devised and bequeathed "all of [his] estate, real, personal or mixed, to [his] beloved children . . . in equal shares."[12] Harris did not specifically leave his house to any particular child or children, nor did each of the siblings necessarily receive a one-third interest in the home. Rather, they were beneficiaries with equal interests or one-third interests in the *entire* estate. Theoretically, had there been substantial assets other than the house, the home could be distributed to a single heir without offending the terms of the will if the other heirs received assets of equal value. Similarly, as touched on by Rodgers during her testimony, the house could be conveyed to one beneficiary if the other beneficial interests were bought out, thereby effectively equalizing the distribution.[13]

"Upon an individual's death, the decedent's property devolves to the persons to whom the property is devised by the decedent's last will . . . *subject to* homestead allowance, family

---

[12] In *In re Estate of Raymond*, 483 Mich 48, 52; 764 NW2d 1 (2009), our Supreme Court recited the rules governing the construction of a will:

> The primary goal of the Court in construing a will is to effectuate, to the extent consistent with the law, the intent of the testator. To accomplish this, a court gives effect to the drafter's intent as indicated in the plain language of the will. The will must be read as a whole and harmonized, if possible, with the intent expressed in the document. If there is no ambiguity, the Court is to enforce the will as written. [Quotation marks and citations omitted.]

[13] We further note that if the quitclaim deed were still in place after the probate estate was opened, the house would not have been part of the estate, and because Rodgers, using the power of attorney, conveyed the property to herself, there would not have been any type of joint ownership or tenancy. This would completely undermine Rodgers' position on appeal. That said, with respect to the quitclaim deed, Rodgers indicated in the inventory that the house was an asset of the estate, the probate court treated the house as being part of the estate, no one argued below that the house was not an estate asset, and Rodgers does not claim on appeal that the home was improperly treated as an asset of the estate. Accordingly, our analysis proceeds on the basis that the house was not owned by Rodgers, that the house was an estate asset, and that the probate court therefore had jurisdiction over matters associated with the house.

-10-

allowance, and exempt property, to rights of creditors, to the surviving spouse's elective share, and to *administration*." MCL 700.3101 (emphasis added).[14] Harris's house became an asset of the estate subject to administration, which was reflected in the inventory. See MCL 700.3706 (duty of personal representative to file an inventory). "[T]o acquire the powers and undertake the duties and liabilities of a decedent's personal representative, a person must be appointed by the register or by court order, must qualify, and must be issued letters[,]" and "[t]he issuance of letters commences *an estate's administration*." MCL 700.3103 (emphasis added).

As part of the administration of the estate, and before the probate estate could be closed, some type of conveyance of the house was absolutely necessary, whether it be sold to a third party, separately transferred to either Rodgers, Willie, or Christopher, or conveyed to any combination of the siblings, applying offsets or buyouts to attain equal division of the estate.[15] Only if there was a distribution of the house by way of conveyance such that title was acquired by at least two of the siblings could there be a joint tenancy relative to ownership of the house. This did not occur. "In Michigan, there are five common types or forms of concurrent ownership that are recognized relative to the ownership of real property, and those are tenancies in common, joint tenancies, joint tenancies with full rights of survivorship, tenancies by the entireties, and tenancies in partnership." *Wengel*, 270 Mich App at 93. "A standard or ordinary joint tenancy is characterized by the four unities, which are (1) unity of interest, (2) *unity of title*, (3) unity of time, and (4) unity of possession." *Id.* at 94 (emphasis added). Here, minimally, there was no unity of title. Assuming that there was evidence that Willie and Christopher could access and reside in the house after the death of their father without any objection by Rodgers, it still would not have created a joint tenancy. Moreover, the fact remained that only Rodgers and her grandson lived in the home, not Willie or Christopher.

MCL 700.3703(1) provides:

> A personal representative is a fiduciary who shall observe the standard of care applicable to a trustee as described by section 7803. *A personal representative is under a duty to settle and distribute the decedent's estate in accordance with the terms of a probated and effective will and this act, and as expeditiously and efficiently as is consistent with the best interests of the estate.* The personal representative shall use the authority conferred by this act, the terms of the will, if any, and an order in a proceeding to which the personal representative is party for

---

[14] Again, the house was not specifically devised to any particular sibling or siblings.

[15] "Until termination of the appointment, a personal representative has the same power over the title to estate property that an absolute owner would have, in trust, however, for the benefit of creditors or others interested in the estate." MCL 700.3711. A personal representative may . . . "[a]cquire or dispose of property, including land in this or another state, for cash or on credit, at public or private sale; and manage, develop, improve, exchange, partition, change the character of, or abandon estate property." MCL 700.3715(1)(f).

the best interests of claimants whose claims have been allowed and of successors to the estate. [Emphasis added.]

"A personal representative shall proceed expeditiously with the settlement and distribution of a decedent's estate . . . ." MCL 700.3704. In this case, Rodgers did not proceed expeditiously and efficiently with respect to the settlement and distribution of the estate. It appears that Rodgers was not even going to open a probate estate, which was why Christopher finally moved forward with his application for informal probate and appointment of personal representative. After Rodgers became the personal representative and was issued letters of authority in May 2020, she did nothing with the house, and nearly two years later, in March 2022, Christopher petitioned the probate court to remove Rodgers as personal representative.

Although she made an uncorroborated claim at the evidentiary hearing that she was not permitted to make any asset distributions while the circuit court case remained pending, Rodgers also testified that she did not place the house on the market because her father did not want the house to be sold. There is no order by the probate court that prohibited Rodgers from transferring or conveying the house, nor did the probate court ever recognize or acknowledge a circuit court order precluding a conveyance. Moreover, Rodgers does not build any argument on appeal that she did not convey or attempt to convey the home for two years because the circuit court in Christopher's case issued an order preventing her from doing so.

Generally, "a personal representative has a right to, and if necessary for purposes of administration, shall take possession or control of, the decedent's property, except that real property or tangible personal property may be left with or surrendered to the person presumptively entitled to that property unless or until, in the personal representative's judgment, possession of the property will be necessary for purposes of administration." MCL 700.3709. As discussed earlier, neither Willie or Christopher were presumptively entitled to the house under the terms of the will, nor did Rodgers leave or surrender the home to her brothers. MCL 700.3709 did not create a joint tenancy with regard to the house. The three siblings were simply not cotenants.

In sum, we reject Rodgers' "joint tenancy" arguments and hold that she was not wrongfully deprived of her possession of the house. There were no unilateral actions taken by Caswell, Christopher, or Willie that ousted Rodgers from the property. The reason that Rodgers lost possession of the home was ultimately her failure to pay rent that was due under the probate court's order. We shall discuss below the validity of the order to pay rent because it relates to the second argument posed by Rodgers on appeal.

2. LIABILITY FOR RENT

Rodgers next argues that as the occupying cotenant of the home, she could not be held liable for rent to the non-occupying cotenants or the estate when there was no agreement to pay rent, the cotenants had access to the house via keys to the locks, and they were never denied access to the residence. Rodgers asserts that the general rule in Michigan is that where one cotenant occupies the premises with the assent of the other cotenant, he or she is not liable for rent. Rodgers maintains that the probate court never engaged in any analysis regarding whether Willie and Christopher were ousted from the property. She argues that she did not have any legal obligation

-12-

to pay rent to her cotenants or the estate, as her brothers had every right to enter and possess the property but chose not to do so, nor did Rodgers prevent them from doing so.

We have already addressed and rejected many aspects of this joint-tenancy/cotenant argument. Furthermore, Rodgers' argument is meritless because it fails to recognize the basis of the probate court's ruling. "[A] personal representative, acting reasonably for the benefit of interested persons, may properly . . . [r]etain property owned by the decedent pending distribution or liquidation, including property in which the personal representative is personally interested . . . ." MCL 700.3715(1)(a). In this case, Rodgers was not acting reasonably for the benefit of interested persons, i.e., Willie and Christopher, and she was thus removed as personal representative by the probate court, which ruling is not challenged on appeal.

Christopher asked the probate court to order Rodgers to pay rent on the authority granted to the court by MCL 700.3712. And, as noted earlier, MCL 700.3712 provides that "[i]f the exercise or failure to exercise a power concerning the estate is improper, the personal representative is liable to interested persons for damage or loss resulting from breach of fiduciary duty to the same extent as a trustee of an express trust." MCL 700.3712. The probate court found that there was an "abundance of evidence to show this court that . . . personal representative [Rodgers] is not performing the duties that she has a statutory obligation to perform in this case." Rodgers did not file a valid accounting in her two years as personal representative, was late in filing a notice of continued administration of the estate, and did not take steps to sell or convey the real property; rather, she simply continued to live in the house with her grandson for two years as if nothing had happened.

We cannot conclude that the probate court committed any error under MCL 700.3712 by ordering Rodgers to pay rent for the period of time that she lived in the home while not expeditiously and efficiently administering the estate. Assuming that Christopher and Willie had access to the house and were not ousted, it had no bearing on the payment of rent by Rodgers under MCL 700.3712 for improperly administering the estate. And her brothers had no obligation to pay rent because they did not live in the house.[16] Contrary to Rodgers' suggestion, the probate court did not order her to pay rent simply because she was living in the house, nor was it relevant to the court whether her two brothers could stay in the home. Instead, the failure to promptly and properly administer and distribute the estate drove the court's ruling regarding rent, which eventually resulted in Rodgers having to vacate the premises for nonpayment. In sum, we hold that the probate court did not err by ordering Rodgers to pay back and future rent for the period of time that she resided in the home.

---

[16] Rodgers does not even address MCL 700.3712. "When an appellant fails to dispute the basis of a lower court's ruling, we need not even consider granting the relief being sought by the appellant." *Denhof v Challa*, 311 Mich App 499, 521; 876 NW2d 266 (2015).

Affirmed. Having fully prevailed on appeal, Caswell may tax costs under MCR 7.219 if any were actually incurred.

/s/ Noah P. Hood
/s/ James Robert Redford
/s/ Allie Greenleaf Maldonado